ESTATE OF McASKILL: BAKER, Executor, Appellant, vs.
McLEOD and wife, Respondents.

*October 10—November 6, 1934.*

For the appellant there was a brief by *Howard D. Blanding* of St. Croix Falls, attorney, and *W. T. Doar* of New Richmond of counsel, and oral argument by *Mr. Doar*.

*James J. McDonald* of Madison, for the respondents.

FRITZ, J. This appeal challenges the allowance of two claims filed by Murdock McLeod and his wife, Lulu

McLeod, against the estate of Dan McAskill, who died on . January 9, 1933, at the age of ninety years. Each of the claims was based on a cognovit note, dated September 19, 1932, and promising, "on demand after date, for value received," to pay to the order of the claimant named therein as payee $1,000, with interest and the expenses incurred for collection. The appellant contends that the court erred in finding, as to each note, that the payee named therein gave valuable or adequate consideration for the note; that McAskill made, executed, and delivered the note to the payee; and that there was due and owing on each note $1,000 as principal, $130 as interest, and $113 as attorney's fees.

The evidence in respect to the making, execution, and delivery of the notes, and the consideration therefor, established the following facts: McAskill was not related to the claimants in any degree. For six months prior to June 23, 1926, and for two years and seven months prior to his death, he roomed and boarded with the claimants, and paid for his board and lodging at the agreed rate of $15 per month. In addition, during all of those periods, and at McAskill's special instance and request, Murdock McLeod attended to the cemetery lot in which McAskill's children were buried, and furnished him with automobile transportation; and Lulu McLeod did his washing, ironing, mending, and writing for him; read to him; washed his feet and bathed him; cut his toe-nails, hair, and whiskers; dressed his sore hand several weeks in August, 1932; took care of his leg for a month in 1932 by keeping it in hot water and by putting on antiphlogistine and hot compacts; and gave him baths, rubbed him with alcohol, brought his meals to him; and gave him such medical attention as he needed, while he was in bed for three weeks in September, 1932. Nothing was paid to the claimants for all of those services otherwise than by delivery of the notes in suit on September 19, 1932. After that date, Lulu McLeod also attended to McAskill during the seven-

teen days of his illness, which culminated in his death, and for those services the court allowed her $4 per day on a separate claim which is not contested on this appeal.

On September 19, 1932, McAskill requested Murdock McLeod to send George W. Wild to his room. Wild was a retired banker who resided in California, but who, with his wife, Kate B. Wild, also roomed and boarded with the McLeods during the summer. Wild, accompanied Murdock McLeod to McAskill's room, and there the latter, in the presence of Murdock McLeod, told Wild that the McLeods had been very good to him; that he had not paid them what it was worth; that he owed them $1,000 apiece; that he wanted to fix it up so when he died he would pay them what he really owed them; and that he did not want to change his will, but wanted to fix it some way so that he could give them what was coming to them. In reply Wild said that he and Murdock McLeod would go to the village bank to have notes drawn. Thereupon they went to the bank for that purpose and shortly thereafter returned with the notes in suit to McAskill's room, accompanied by Mrs. Wild. In the presence of the latter and Murdock McLeod, Wild, at the request of McAskill, read the notes to him and asked him if that was what he wanted. McAskill said that was the way he wanted it, and signed them by writing his cross. Mr. and Mrs. Wild signed as witnesses, and then Wild, in McAskill's presence, handed both notes to Murdock McLeod. He took the notes downstairs immediately and handed them to Lulu McLeod, who kept them in her possession until the claimants produced them in court. There was also testimony by Wild that "at the time he signed this note it was understood between me and Mr. McAskill the note wasn't to take effect until after he died, that's what he intended and meant."

The facts established as stated above well warranted the court's findings, that McAskill intended that the additional service rendered for him by Murdock and Lulu McLeod,

and for which he considered himself indebted to each of them for $1,000, should constitute the consideration for the notes; that the notes were made and executed by McAskill; and that in his presence and with his acquiescence they were delivered for him by Wild to Murdock McLeod for himself and his wife. There is nothing in the record that impeaches in the slightest degree the undisputed evidence that the notes were prepared solely at the direction of McAskill; that they were entirely to his satisfaction; that he voluntarily executed them; and that, with his apparent acquiescence and approval, they were placed in the possession of Murdock McLeod, who immediately handed them to his wife, and that they remained in their joint possession and exclusive control until the latter produced them in court. Under the circumstances the proof clearly establishes a valid and intentional delivery by McAskill, on September 19, 1932, even without occasion to resort to the rule, applicable to negotiable paper, that "where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved." Sec. 116.20, Stats.; *Sheldon v. Blackman,* 188 Wis. 4, 12, 205 N. W. 486.

There is nothing in the evidence that warrants even an inference that the delivery was merely conditional. Wild's testimony that it was understood between him and McAskill, and that the latter meant and intended that the note was not to take effect until he died, was not to the effect that delivery was to be merely conditional or deferred until McAskill's death. At most, Wild in that testimony merely states his conclusion as to what was understood between him and McAskill, and what the latter intended and meant. However, there is no proof of any statement, written or oral, from which the existence of any such understanding can be inferred, or which affords any basis for the conclusion stated

by Wild. · It is well established that, in the absence of fraud or mistake, no effect can be given by the court to any intention which is not expressed by the language of the notes, when looked at in the light of such facts as were properly in evidence (*Gillmann v. Henry*, 53 Wis. 465, 470, 10 N. W. 692) ; and that the contract expressed by the notes as written cannot be varied or added to by parol evidence as to any contemporaneous oral statements or agreement at variance with the contract as expressed in writing. *La Fayette County Monument Corp. v. Magoon*, 73 Wis. 627, 634, 42 N. W. 17; *Remington v. Detroit Dental Mfg. Co.* 101 Wis. 307, 309, 77 N. W. 178. On the other hand, the notes would not necessarily have been invalidated even if there had been competent proof establishing that it was intended that there should be no payment thereof until after McAskill's death. As was said in *Sheldon v. Blackman, supra,* page 15 :

"It is well settled that an instrument otherwise valid as an agreement for the payment of money is not invalidated merely because payment is postponed until or after death."

In regard to the court's finding that there was valuable and adequate consideration for the notes, it must be noted that, as the notes were negotiable, they are deemed *prima facie* to have been issued for a valuable consideration (sec. 116.29, Stats.; *Bank of Monticello v. Dooly,* 113 Wis. 590, 89 N. W. 490) ; and also, that as the notes were executed under seal, the latter imports consideration. Sec. 328.27, Stats. However, regardless of those presumptions, the evidence establishes that both of the claimants, at the special instance and request of McAskill and for his benefit, had rendered valuable services, for which he voluntarily acknowledged that he had become indebted to each of the payees in the sum of $1,000, and which he did not consider included in the service paid for by the $15 per month that he had agreed to pay for solely his board and lodging. Under those circumstances,

the claimants, who were not mere volunteers, or so related to McAskill that the service was presumably gratuitous, could have maintained an action to recover for the reasonable value of their additional services. Likewise, under those circumstances, and particularly the fact that McAskill had voluntarily acknowledged that he was indebted to each claimant in the sum of $1,000, his notes to them in that amount were manifestly not intended by him to be, and were not, mere promises to make a gift as were the notes in *Tyler v. Stitt,* 127 Wis. 379, 106 N. W. 114. On the contrary, as was held in *Sheldon v. Blackman, supra,* McAskill's notes constituted a present, definite, and absolute obligation to pay on demand, and the services which claimants had performed for him at his request, and for which he deliberately chose to pay $1,000 to each claimant, constituted valuable and sufficient consideration for the notes. Under such circumstances, even though the value of the services may be deemed by others to be less than the promised amount, that does not necessarily warrant holding that there is a failure, or partial failure, of consideration. When the value of services performed under such circumstances is indefinite, or indeterminate, or largely a matter of opinion, the courts will not substitute their judgment for that of the contracting parties. No one knew the value of the services as well as McAskill. In relation to McAskill, as well as the services which constituted the consideration for the notes in suit, there can be said, as was said in relation to the maker of a note and consideration.therefor in *Sheldon v. Blackman, supra:*

"Evidently he did realize their worth and desired to make liberal compensation, which he had the perfect right to do. If he deliberately chose to pay more than the services were really worth, he had the right to do so. . . . There had been a consideration of inestimable value for the execution of the note, and it was in no sense a gift. The utmost that can be fairly claimed is that the consideration for the note was in-

adequate. But under such facts as here exist, mere inadequacy does not amount to a failure or partial failure of consideration. Of course that may be a circumstance relevant to the issue where fraud or duress or undue influence is claimed, but in this case there is no suggestion of such a claim. There might be circumstances under which the inadequacy of consideration might be so grossly disproportionate to the value of the benefit received or the services rendered that a court might feel justified in refusing to enforce the contract. In this case, where there was no element of fraud or misrepresentation, the value of the services may be measured by the wants of the persons benefited. To hold that this agreement, deliberately made, should be set aside or impaired would be a denial of the right of parties to make their own contracts. There is abundant authority for the rule that when the value of services is indefinite or indeterminate or largely a matter of opinion, the courts will not substitute their judgments for that of the contracting parties. [Cases]."

The contention that the court erred in finding that the sum of $130 was due on account of interest on each note, was based on the fact that the court allowed interest at the rate of ten per cent, instead of four per cent, per annum, from January 19, 1933, when the claims were filed in county court, until they were allowed on March 20, 1934. The notes provided for the payment of "One Thousand Dollars, with interest to maturity at four per cent per annum, payable annually, principal and interest not paid when due shall bear interest at the highest rate of interest allowed by law." Appellant contends that the penalty rate, thus provided for in excess of the four per cent rate, should not be held applicable until the executor was warranted in paying the claim upon the allowance thereof by the court. That contention cannot be sustained in view of the express and unambiguous terms and legal effect of the provision above quoted in relation to the rates of interest payable after the notes became due. As they were payable on demand, they became due as soon as there was a lawful demand of payment. In the cases at bar

there was no such demand made otherwise than by the filing of the claims against McAskill's estate on January 19, 1933. But such filing is considered in law the same as the commencement of an action (*Frawley v. Cosgrove,* 83 Wis. 441, 443, 53 N. W. 689) ; and as the commencement of an action against the maker, on a note payable on demand, is generally held to constitute the making of a demand thereon (8 C. J. p. 530, § 742), such commencement is sufficient to render the maker liable for such rate of interest as is payable upon default in payment. *Van Vliet v. Kanter,* 139 App. Div. 603, 124 N. Y. Supp. 63; *Cooke v. Clark's Committee,* 21 Ky. Law Rep. 316, 51 S. W. 316; *Adams v. Adams,* 55 N. J. Eq. 42, 46, 35 Atl. 827; *Hunt v. Nevers,* 15 Pick. (Mass.) 500, 505, 26 Am. Dec. 616. Consequently, as by the filing of the claims a sufficient demand was made on January 19, 1933, to cause the notes to become past due from and after that date, and as they were "not paid when due," the provision in the notes for "the highest rate of interest allowed by law," became operative, and the court did not err in allowing interest at the rate of ten per cent from January 19, 1933, until judgment on the claims was entered on March 20, 1934.

Appellant's contention that the court erred in allowing the sum of $113 as ten per cent attorney's fees, is based on the proposition that sec. 324.11, Stats., provides that the attorney's fees allowable as part of the taxable costs in county court matters, "shall not exceed twenty-five dollars." However, the sum of $113 allowed on each claim as attorney's fees, was not allowed by the court as part of the costs taxable under sec. 324.11, Stats. The court, in its conclusions of law, expressly held that the sum of $113 was recoverable in each instance "as attorney's fees provided for in the note." That conclusion was warranted by the provision in the notes that the maker agreed "to pay any and all costs and expenses (including ten per cent attorney fees) paid or incurred in

collecting the same." By virtue of that provision, McAskill expressly incurred the obligation to pay ten per cent attorney's fees incurred in collecting the note, and recovery thereof as allowed by the court, was not dependent upon the allowance of attorney's fees as part of the taxable costs authorized by sec. 324.11, Stats., but was rightly based on the contractual obligation incurred by McAskill. The entry, in fact, of a cognovit judgment on the notes was not essential to the existence of liability under that obligation because the agreement was to pay expenses incurred for attorney's fees in collecting the notes, regardless of whether a judgment was in fact entered.

*By the Court.*—Judgments affirmed.