Estate of Hatten: First Wisconsin Trust Company, Administrator, Appellant, vs. Monsted, Claimant, Respondent.

*October 10, 1939—January 16, 1940.*

201

202

For the appellant there were briefs by *Miller, Mack & Fairchild* of Milwaukee and *Brazeau & Graves* of Wisconsin Rapids, and oral argument by *R. B. Graves,* and *J. G. Hardgrove* and *Richard F. Mooney,* both of Milwaukee.

For the respondent there were briefs by *Benton, Bosser, Becker & Parnell,* attorneys, and *David L. Fulton* of counsel, all of Appleton, and oral argument by *Mr. Edgar E. Becker, Mr. Homer H. Benton,* and *Mr. Fulton.*

The following opinion was filed November 7, 1939:

NELSON, J. The administrator contends that the court erred in finding that the note was in fact signed by decedent or that any part of it was in his handwriting; in finding that at the time the note was alleged to have been given, decedent was competent to conduct the transaction or to give the note alleged to have been given; in finding a valuable consideration sufficient to support the note and that the note, if executed and delivered by decedent, was given for those considerations; in finding that the note, if given, was not the result of undue influence exercised by claimant over decedent; and in finding that the claimant was entitled to attorneys' fees and the amount awarded her. The administrator further contends that the court erred in concluding that the claimant was entitled to any judgment.

The following facts are not in dispute: The claimant is sixty-four years of age, and has been a resident of New

London for twenty-seven years. She is the widow of John Winfield Monsted, a physician who practiced his profession in the city of New London for many years prior to his death, which occurred in 1932. The claimant has two sons. Robert Monsted, aged thirty-five, owns and operates a resort at Lake Poygan in this state during the summer months and lives with his mother, the claimant, during the winter months. John W. Monsted, her other son, is a physician, who has practiced his profession in the city of New London for about eleven years.

William H. Hatten, prior to his death, which occurred on March 30, 1937, was extensively engaged as a lumberman in this state and in the south. He resided in New London during the greater part of his life. He was very successful in the lumber business and was public spirited and interested in education and politics. At the time of his death he was a member of the boards of trustees of Ripon and Lawrence colleges. Mr. Hatten never married, and for many years prior to his death, lived at the Elwood Hotel in New London. He left an estate, which was appraised at over $3,000,000. Mr. Hatten was not related by blood or marriage to the claimant or to any member of her family.

It is not disputed that close friendly relations existed between Mr. Hatten and the claimant and her family for more than twenty-five years. During all of those years he frequently was invited to the Monsted home, and often went there without formal invitation, where he was given meals, and where he enjoyed the companionship of the Monsteds and the privileges of their home. During the years immediately preceding his death his visits to the Monsted home became more frequent. During the last two years preceding his death, when he was in New London, he was at the claimant's home for meals, three or four times a week. In many respects, he treated the Monsted home as though it were his own. Mr. Hatten neither owned nor drove an automobile. On many occasions he was transported in the Monsted

automobile to Appleton and to other cities and places. Many of these trips were made at his specific request, and for them the claimant received no compensation. Many times, without invitation, he would go to the Monsted home at regular mealtimes and many times after such mealtime was past and was furnished meals which he seemed to enjoy.

The claimant testified that on numerous occasions Mr. Hatten expressed his appreciation to her for all that she had done for him and stated that some day she would be paid well for such services. Two specific instances of such promises were detailed by the claimant. At one time he said to her:

"What you are doing for me you will be well paid for it,"—

and on another occasion, in the presence of her son, similarly expressed himself. After carefully reading the testimony it cannot be doubted that during many years Mr. Hatten was often invited to the Monsted home and always felt free to go there without invitation, to enjoy the privileges of that home, to be transported in the Monsted automobile on both business and pleasure trips and all without compensation or the reciprocal giving or furnishing of meals.

Upon the trial, after the note was introduced in evidence, accompanied by testimony that no part of it had been paid, and the amount of the accrued interest, the claimant rested, reserving, however, the right to offer rebuttal testimony. The administrator then called the claimant adversely and examined her at some length. Her testimony thus elicited by the administrator was in substance that Mr. Hatten had signed the note at her house on a form furnished by her to him pursuant to his request; that at that time she and Mr. Hatten were alone in her library, which was just off the living room; that she filled out part of the blank spaces in the note, i. e., "Jan. 21," "7," "One Year," "Beatrice E. Monsted," "Twenty-five thousand oo/100," and that the words "to be taken from my estate," were in the handwriting of

Mr. Hatten and written at the time he signed the note; that she loaned him no money on that day, and that she entered into no contract with him on that day except what might be expressed in the note.

The circumstances surrounding the execution of the note, as testified to by the claimant, are substantially as follows: On January 21, 1937, Mr. Hatten came to her home between 12 and 1 o'clock in the afternoon and had lunch there. He had not been invited to the Monsted home on that occasion. After lunch the claimant and Mr. Hatten went into the library and after a while Mr. Hatten said: "Let's finish up that note." He drew from his pocket a note form upon which he had written "Mrs. J. Monsted." The claimant said to him: "Why not write in Beatrice E. Monsted because my son's wife's name is Mrs. J. Monsted as well as my own?" He said: "Have you another blank?" She said she had, and took from her desk a blank note form which she had left over from administering her husband's estate and handed it to him. He handed it back to her saying: "You write in your name and the date." This she did. Mr. Hatten then said: "Write in $25,000." Claimant said: "My, isn't that a lot of money?" He replied:

"Well, it isn't for what you have done for me and what the privileges in your home have meant to me. It means so much to me, what you have done for me and the privilege of coming to your home and what your family have done for me."

He then told her to write in the interest rate at five per cent. After she had done that he sat down at the desk and took up her pen. It was a fountain pen and somewhat stiff and did not work very well. After a time he succeeded in making the ink flow and signed his name to the note. Mr. Hatten then stated:

"Now, this is my obligation, I want you to come to me. The Hatten Lumber Company has nothing to do with this."

The claimant replied:

"Why don't you write in something to that effect?"

Mr. Hatten drew an envelope from his pocket and after writing on it for a time, wrote on the note these words: "To be taken from my estate" and handed it to the claimant. The note is a judgment note which reads as follows:

"New London, Wis., Jan. 21, 1937.

"One year after date, I, we, each and severally promise to pay to the order of Beatrice E. Monsted at New London, Wis., twenty-five thousand oo/100 dollars, value received, with interest at 5 per cent, per annum, until paid the makers, guarantors and indorsers hereof waive demand notice of nonpayment, protest and notice of protest. And agree to pay all attorneys' fees and costs if placed in hands of an attorney for collection or for suit. [Authorization to any attorney to confess judgment omitted.]

"To be taken from my estate.

"WM. H. HATTON."

The words and figures "Jan. 21," "7," "One year," "Beatrice E. Monsted," "Twenty-five thousand oo/100," and "5" were concededly in the handwriting of the claimant. According to her testimony, the words "To be taken from my estate," and the signature "Wm. H. Hatton," were written by Mr. Hatten.

We shall content ourselves with this preliminary statement and shall proceed to consider the several contentions of the administrator. In considering those contentions we shall briefly recite the relevant evidence adduced by the parties. We shall consider them in the order followed by the trial court.

The administrator contends that the trial court erred in finding that the note was in fact signed by Mr. Hatten or that any part of it was in his handwriting. This contention assails the findings of the trial court that the interlineations: "To be taken from my estate," and the signature, "Wm. H. Hatton," were in the handwriting of Mr. Hatten. While

the administrator, in its amended answer, only denied having any knowledge or information sufficient to form a belief that the decedent executed and delivered the note, it adduced testimony tending to prove that the signature of Mr. Hatten was a forgery and the words, "To be taken from my estate," were not written by him. The administrator, therefore, charged and obviously attempted to prove that the signature to the note was a forgery. In civil actions, where fraud, crime, criminal conduct, or conspiracy is alleged, the burden rests upon him who so charges, to establish the proof of such allegations by clear and satisfactory evidence, *Max L. Bloom Co. v. United States C. Co.* 191 Wis. 524, 210 N. W. 689; *Muska v. Apel,* 203 Wis. 389, 232 N. W. 593; or by the clear and satisfactory evidence to a reasonable certainty, *Lange v. Heckel,* 171 Wis. 59, 175 N. W. 788; or by clear, satisfactory, and convincing evidence, *Parker v. Hull,* 71 Wis. 368, 37 N. W. 351; *Milonczyk v. Farmers Mut. Fire Ins. Co.* 200 Wis. 255, 227 N. W. 873.

Upon appeal to this court, when a finding of fact is assailed, the finding of the trial court will be upheld unless it is against the great weight and clear preponderance of the evidence.

The administrator produced John F. Tyrrell, an examiner and photographer of questioned documents. He had examined many signatures of Mr. Hatten which were concededly genuine and other authentic writings of Mr. Hatten. He enumerated many ways in which in his opinion the signature to the note and the interlienation "To be taken from my estate" differed from the "standards," the genuine writings of Mr. Hatten, and finally expressed his conclusion that Mr. Hatten neither wrote the signature nor the interlineation. We deem it unnecessary to review his testimony at length or to point out the many reasons for his conclusion. His testimony as an expert was entitled to and no doubt given careful consideration by the trial court. However, his testimony was expert in character and obviously not conclu-

sive. The claimant, on the other hand, testified that she saw Mr. Hatten sign the note and saw him write the interlineation. Mr. E. H. Becker, who had been assistant cashier of the First National Bank of Oshkosh for more than thirty years and who, for a good share of that time, had been a teller at that bank, at which Mr. Hatten had done business, testified that he would pay Mr. Hatten's check for $25,000 on that signature; that if it was on a blank check that did not contain his name, he would, in accordance with banking custom, not cash it. George W. Schwartz, an examiner of questioned documents, was produced by the claimant. He likewise had compared the signature on the note with other genuine signatures of Mr. Hatten, had made photographs and photographic enlargements thereof in his laboratory in Chicago, and testified to his conclusion that the numerous genuine signatures and the signatures to the note were in the handwriting of one and the same person. We think it clear, that in this state of the record, it must be said that a plain question of fact was presented, and that the credibility of the witnesses and the weight to be given their testimony was for the trial court. While the administrator makes a persuasive argument, based upon the testimony of Mr. Tyrrell, it is not within our province to pass upon the credibility of the witnesses or the weight of the evidence. If the trial court, who saw the claimant upon the stand and observed her manner of testifying, was right in deeming her testimony credible, then obviously the signature to the note was not a forgery.

In the recent case of *Will of Miller*, 201 Wis. 148, 150, 229 N. W. 656, the following was quoted with approval from *Estate of Johnson*, 170 Wis. 436, 175 N. W. 917:

" ' . . . The positive testimony of witnesses whose integrity and credibility is otherwise unassailed is not outweighed or overcome by the testimony of handwriting experts, who express opinions only. The testimony of honest witnesses who state that they know what they testify to is more convincing than theory. . . .' "

Having in mind the rule as to the burden of proof hereinbefore stated, and the rule which requires us to uphold the findings of a trial court if not against the great weight and clear preponderance of the evidence, we conclude that the finding of the trial court that both the signature and the interlineation are in the handwriting of Mr. Hatten should not be disturbed.

The administrator next contends, assuming for the purposes of argument that the note was signed by Mr. Hatten, that he was, on January 21, 1937, incompetent to carry through a transaction such as claimant described or to give a note such as is pleaded. The trial court found that at the time of the execution and delivery of said note on January 21, 1937, the deceased was competent to and did in fact understand and comprehend the nature and effect of said transaction. Here again is a finding as to a plain question of fact, which, under the rule, may not be disturbed unless against the great weight and clear preponderance of the evidence. On this branch of the case the testimony is voluminous and no attempt will be made fully to review it. Mr. Hatten, at the time of his death on March 30, 1937, was in his eighty-first year. It is contended by the estate that the real break between his competency and incompetency occurred on February 12, 1935, when he fell or collapsed in the middle of an icy street in the city of Appleton. Whether he had some sort of a stroke, or sustained injury as a result of a fall, does not clearly appear from the testimony; he was mentally confused for some time thereafter. The administrator contends that the evidence shows that after that fall he rapidly became senile and at times mentally deficient, unable to carry on a sustained conversation or to transact with understanding any business; that he became careless in his dress, penurious in his habits, unable at times to sense where he was even while on the streets of New London; that he was subject to delusions and hallucinations, at times became

confused in many ways and lost the ability to remember names, faces, familiar places, or routes with which he had formerly been thoroughly familiar. Much of the testimony describing Mr. Hatten's physical and mental condition during the years 1936 and 1937, up to the time of his death, was given by his business associates, Hartquist, Freeman, Feathers, and Norris. Mr. Hartquist testified that it was difficult to discuss business matters with Mr. Hatten in the office when he would have "those spells, when he was not himself."

"We would say, 'Let's wait until his mind clears and he is in better condition,' and we would try to get him to have a good night's sleep. His condition was not the same at various times during the day. If we could get him to sleep well at night so he would get the better part of his night's sleep then he would be all right in the morning, but toward noon he would start to float off and talk about a lot of peculiar things that we knew there was no use talking business with him any further."

Mr. Hartquist further testified:

"His mind opened and closed is what I have always said. Open when he was normal and we could talk to him. When it closed it was a blank and he would want to talk about men marching through his room or this man in his window. He thought there was a man in his window. We found later that it was his own reflection in the mirror so we hung a piece of paper over the mirror so he could not see that man."

Mr. Hartquist testified that during the times when Mr. Hatten's mind was shut he was not capable of conducting a transaction such as was involved in giving a note of $25,000. On cross-examination, Mr. Hartquist, however, testified that Mr. Hatten was present at the annual meeting of the Hatten Lumber Company on January 1, 1937; that his mind was active and well on that day; that he had times when his mind was quite normal,—during the entire months of January, February, and March, up to the time of his last sickness.

On these occasions the witness was of the opinion that he would be able to understand the nature and effect of a business transaction. He testified that he would say that Mr. Hatten was in good shape on January 30, 1937, when he signed a check for $10,000 as a gift to the city of New London for a park; that at that time he was competent and mentally alert so as to be able to understand the nature and effect of a business transaction. Mr. Hatten was the president of the Hatten Lumber Company up to the time of his death and signed checks for the Hatten Lumber Company, which were countersigned by Mr. Morse, as treasurer.

Mr. Freeman testified that Mr. Hatten executed certain papers and documents in 1936 and 1937 and that he was competent at times so to do; that after he had slept the night before he would be very good; that there were times when he would talk all right and seemed to be all right and then we would take up propositions with him; that at those times we thought his mind would be clear and he would be perfectly normal and that that condition existed up until the time he went to the hospital. Mr. Freeman likewise testified to incidents revealing that Mr. Hatten was at times suffering from delusions and hallucinations, but likewise testified that when Mr. Hatten got a good night's rest he was in better condition during the fore part of the day than he was in the afternoon; that he considered Mr. Hatten competent to transact business on January 5, 1937, when he in fact executed a deed; that on November 2, 1936, when Mr. Hatten signed a contract as president of the Hatten Lumber Company, he was mentally competent to execute that agreement; that on January 30, 1937, when Mr. Hatten delivered the $10,000 check to the park committee for the use of the city of New London, Mr. Hatten was competent to transact business; that that was a day when Mr. Hatten was bright; and that in his opinion Mr. Hatten at that time would have been competent and able to understand the nature and effect of

a business transaction such as the execution of the note in question.

Mr. Norris, an employee of the Hatten Lumber Company, testified that during the last four or five months of Mr. Hatten's life he was at times normal and at other times not normal. There were other witnesses who testified on behalf of the administrator to incidents and actions tending to show that at the times of their occurrences Mr. Hatten was incompetent. On the other hand, there were witnesses, other than the claimant, who saw him quite often during the year or so before his death, and who testified that at those times he was normal and able to talk rationally and coherently and discuss current subjects such as politics and education; that at such times he was competent to enter into a business transaction and able to understand the nature and effect of it. Robert Monsted, the claimant's son, who lived at home during the winter times, often saw Mr. Hatten at his mother's home and talked to him. He testified that at those times there was nothing in Mr. Hatten's conversation to indicate that he was mentally incompetent. Mr. Jennings, who with a group of other men was instrumental in obtaining the $10,000 donation for the park from Mr. Hatten, testified that Mr. Hatten was competent on January 30, 1937, to transact business and on that day was perfectly competent to do business. Mr. Jost, cashier of the First State Bank of New London, saw Mr. Hatten frequently during 1936 and 1937, and talked with him on many occasions. He testified that the conversations had with Mr. Hatten at those times revealed that he was intelligent and alert and that whenever he talked to Mr. Hatten his conversation appeared to be intelligent. There was considerable other testimony to the same effect. The administrator adduced no testimony relating to Mr. Hatten's mental condition on January 21, 1937, the day when he executed the note in question, except that given in response to hypothetical questions.

Dr. Herbert W. Powers, of Milwaukee, an expert on mental diseases and mental disorders, testified in response to a long hypothetical question, that in his opinion Mr. Hatten was incompetent on January 21, 1937; that at that time he did not have the mental capacity to recall services, in recognition of which it is claimed the note was given, or to consider and determine whether there rested on him a legal or moral obligation to make payment therefor, or to weigh and consider the value of such services and then exercise a reasonable judgment in reference to all of such things. Dr. F. J. Pfeifer, produced by the administrator, testified in response to the hypothetical question, that on January 21, 1937, Mr. Hatten was incompetent to do business. However, on cross-examination and in response to a modification of the hypothetical question propounded, he testified that in his opinion Mr. Hatten was competent when he signed the note. The doctor further testified "that a person suffering from senile dementia has lucid intervals, if they are brought on from the outside. Generally they need a little encouraging."

It is clear that all of this testimony bearing upon the mental condition of Mr. Hatten reveals that at times he was incompetent and at other times competent to transact business. A pure question of fact was presented by the evidence; the credibility of the witnesses and the weight of their testimony was for the trial court. Under the established law, we cannot say that the finding of the court that Mr. Hatten was competent on the afternoon of January 21, 1937, when he executed the note, is against the great weight and clear preponderance of the evidence.

The administrator further contends that the court erred in finding that there was a valuable consideration sufficient to support the note and that the note was given for those considerations. The trial court found in substance that for twenty-five years prior to January 21, 1937, the claimant had rendered services, furnished meals, and extended the privileges of her home and the use of her automobile to the

deceased at his express instance and request; that on two specific occasions during the year 1936, and on numerous other occasions, he promised to pay the claimant for such services, meals, privileges, and the use of her automobile; that such services, meals, etc., were not intended by the claimant to be gratuitous, and they were furnished and extended with the intention and expectation of being paid therefor; that said services, etc., were of material and pecuniary value to the deceased, and that the deceased deemed himself to be legally and morally indebted to the claimant therefor in the sum of $25,000, which he considered to be fair compensation to claimant for the same, and that the consideration for said note was the services, meals, privileges of the home, and the use of the claimant's automobile.

Were we required to determine whether the services, meals, etc., were reasonably worth the sum of $25,000,—in other words, if this action were one to recover *quantum meruit,*—we should have no hesitation in holding that they were not reasonably worth that amount. That question, however, is not before us. The claimant's claim is founded upon a negotiable promissory note. There must, of course, be consideration to support it, otherwise it is subject to the defense of no consideration as between the parties to it and as against one who is not a holder in due course. Sec. 116.33, Stats. Every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration. Sec. 116.29, Stats. Want of consideration may, of course, be shown, but the burden upon him who asserts such want of consideration is the same, or at least as great, as that required to establish a mistake. *Estate of Flierl,* 225 Wis. 493, 274 N. W. 422. To reform a written instrument on the ground of mistake the proof must be clear and satisfactory. *Hoeft v. Kennedy,* 214 Wis. 187, 252 N. W. 589.

"Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes value." Sec. 116.30, Stats.

In 7 Am. Jur. p. 927, § 234, under the title "Bills and Notes," it is stated:

"Legal consideration may be of slight value, or it may be a trifling benefit, loss, or act, or it may be of value only to the promising party. It may be of indeterminate value, such as property the value of which is incapable of reduction to any fixed sum and is altogether a matter of opinion, the good will of a business, personal services, or an act which affords the promising party pleasure or gratification, pleases his fancy, or otherwise merits, in his judgment, his appreciation."

It is also said in that same section:

"The law concerns itself only with the existence of legal consideration for a contract. Mere inadequacy of the consideration is not within this concern. The adequacy in fact, as distinguished from value in law, is for the parties to judge for themselves. There is no rule by which the courts can be guided if once they undertake the determination of such adequacy. However, nothing is consideration that is not regarded as such by both parties."

See also *Estate of Miller,* 173 Wis. 322, 327, 181 N. W. 238, where it was said:

"Whether or not a consideration is adequate is a matter exclusively for the decision of the parties. 1 Williston, Contracts, § 140."

and also *Rust v. Fitzhugh,* 132 Wis. 549, 557, 112 N. W. 508, where it was said:

"Generally speaking, a valuable consideration however small is sufficient to support any contract; that inadequacy of consideration alone is not a fatal defect." (Citing cases.)

In *Sheldon v. Blackman,* 188 Wis. 4, 10, 205 N. W. 486, a claim for $30,000, based upon a written promise to pay at death and an acknowledgment of indebtedness for services rendered, was upheld. The estate defended on the ground that the consideration was inadequate. It was there said:

"In this case the services had been rendered under such conditions and were of so intimate and delicate a character

that their value could be estimated with no degree of mathematical certainty. No one knew their value so well as Mr. and Mrs. Wilkinson, and if he had not appreciated their value he would have been guilty of gross ingratitude. Evidently he did realize their worth and desired to make liberal compensation, which he had the perfect right to do. If he deliberately chose to pay more than the services were really worth, he had the right to do so. To receive the consideration and respect of others and to be able to be generous in later life are among the motives which prompt men to practice economy and self-denial. There had been a consideration of inestimable value for the execution of the note, and it was in no sense a gift. The utmost that can be fairly claimed is that the consideration for the note was inadequate. But under such facts as here exist, mere inadequacy does not amount to a failure or partial failure of consideration. . . . There is abundant authority for the rule that when the value of services is indefinite or indeterminate or largely a matter of opinion, the courts will not substitute their judgment for that of the contracting parties."

Substantially similar language was used in *Estate of Mc-Askill*, 216 Wis. 276, 282, 257 N. W. 177, in upholding two claims against that estate based on promissory notes given in acknowledgment of services and care, deemed by the promisor not to have been paid for by the regular monthly compensation theretofore paid. The court said:

"Under such circumstances, even though the value of the services may be deemed by others to be less than the promised amount, that does not necessarily warrant holding that there is a failure, or partial failure, of consideration. When the value of services performed under such circumstances is indefinite, or indeterminate, or largely a matter of opinion, the courts will not substitute their judgment for that of the contracting parties. No one knew the value of the services as well as McAskill."

In *Citizens' National Bank of Pocomoke City v. Custis*, 155 Md. 173, 176, 141 Atl. 556, a claim for $10,000, based upon a promissory note executed by the deceased, was upheld. The evidence showed that the claimant lived near to

the home of the deceased and had rendered, during a considerable period of time, personal services to the deceased, in recognition of which the note in suit was given. The court said:

"A sufficient reference has been made to the testimony for the plaintiff to indicate its nature and effect. It tended to prove that the plaintiff rendered valuable and long continued services to the defendant's testator, for which he felt obligated to pay, and for which the note in question was intended as compensation. The decedent was in a position to estimate the value to him of the ministrations which he thus accepted from one with whom he had no family relationship. His resources were ample for the payment of the note by which his appreciation of the service was given practical expression. It would not be proper to hold that the note was without consideration because the reward it provided might be regarded as unnecessarily generous."

Under the law, which requires clear and satisfactory proof of want of consideration, the trial court may well have concluded that the administrator failed to meet that burden. It must be held that the finding of the trial court, that the note was supported by a valuable consideration, cannot be said to be against the great weight and clear preponderance of the evidence. The finding of the trial court was obviously largely based upon the testimony of the claimant. Her credibility and the weight of her testimony were for the trial court's determination.

Moreover, in this state we have adopted what is said to be the liberal rule as to moral consideration, and have held that a receipt by the promisor of an actual benefit will support an executory promise, and that a moral consideration may be sufficient to support an executory promise "where the promisor originally received from the promisee something of value sufficient to arouse a moral as distinguished from a legal obligation." *Park Falls State Bank v. Fordyce,* 206 Wis. 628, 635, 238 N. W. 516. In *Elbinger v. Capitol*

*& Teutonia Co.* 208 Wis. 163, 165, 242 N. W. 568, in commenting upon the holding in *Park Falls State Bank v. Fordyce, supra,* it was said:

"We there held that whenever the promisor has originally received value, material pecuniary benefit, under circumstances giving rise to a moral obligation on his part to pay for that which he has received, it is a sufficient consideration to support a promise on his part to pay therefor." See also *Estate of Smith,* 226 Wis. 556, 277 N. W. 141.

In *Onsrud v. Paulsen,* 219 Wis. 1, 4, 261 N. W. 541, it was said:

"A consideration may consist of a benefit to the promisor or a detriment to the promisee."
and the law stated in *Park Falls State Bank v. Fordyce, supra,* was again followed.

The defendant further contends that the proven facts raised a presumption of undue influence which the claimant has not met.

In view of the fact that the evidence relating to the execution of the note has been fully recited, and much of the evidence relative to the mental condition of the deceased has been recited, we see no useful purpose in reciting the evidence in connection with the issue of undue influence.

The trial court found that on January 21, 1937, the deceased was not susceptible to undue or improper influence; that the making, execution, and delivery of the note did not indicate or evidence that undue influence on the part of the claimant had been exercised; that the claimant on that day or at any time prior thereto had exercised or had a disposition to exercise any undue or improper influence over the deceased in the making of the note; and that the note was the free act and deed of the deceased. We are of the opinion that those findings are not against the great weight and clear preponderance of the evidence and therefore may not be disturbed.

The administrator further contends that the court erred in holding that the claimant was entitled to recover, in addition to the principal of the note and interest, the sum of $1,325 as attorneys' fees under the provision of the note that the maker agrees "to pay all attorneys' fees, and costs if placed in the hands of an attorney for collection or for suit." This contention is grounded upon the fact that the note itself was not filed with the court within the nonclaim period, and that the claim filed within that period did not make the note a part of the claim or specifically incorporate into the claim the terms concerning the payment of attorneys' fees contained therein. The claimant, in both the original claim filed and in her complaint, pleaded a claim based upon a promissory note. That was sufficient to permit a recovery according to the terms of the note, and the attorneys' fees were within the scope of the claim. Had the claim been allowed and paid without a contest, the claimant would not have been entitled to attorneys' fees. Merely filing a claim against an estate would hardly be considered as an act of placing the note in the hands of an attorney for collection or for suit. Compare *Estate of McAskill, supra.*

In our opinion the trial court was justified in allowing the plaintiff reasonable attorneys' fees.

We may say in conclusion that every finding of the county court which the administrator contends was not supported by the evidence is upheld on the ground that it is not against the great weight and clear preponderance of the evidence. Had the county court found as the administrator contends it should have found upon the evidence, such findings doubtless would have had to be upheld for the same reasons. The issues of fact were peculiarly for the determination of the county court. The trial court reserved its decision for several months after having had the benefit of full arguments made in the written briefs. Its decision re-

veals careful study and analysis of the issues and a knowledge of the applicable law.

*By the Court.*—Judgment affirmed.

FOWLER, J. (*dissenting*). To the rulings of the court that the findings of the trial court that Mr. Hatten signed the note in suit, that he was mentally competent at the time he signed it, and that there is no evidence that his signature was procured by undue influence exercised by the claimant, must be sustained, I agree. These findings cannot be said to be against the great weight and clear preponderance of the evidence and therefore must be sustained on appeal. But I cannot go any further with the court than this.

The three findings of the trial court above referred to being sustained it follows that Mr. Hatten could by will bequeath to the claimant $25,000 if he wanted to. The note in suit is not a will for want of execution with the formalities required for a will. Also he might have made a gift of $25,000 to the claimant if he wanted to, but a promissory note is not a gift, but only an unexecuted promise to make a gift. *Tyler v. Stitt*, 127 Wis. 379, 106 N. W. 114; *Estate of Smith*, 226 Wis. 556, 277 N. W. 141.

It is true that a promissory note payable after the death of the maker may be enforced if it is supported by a valuable consideration. A good consideration is not sufficient. *Smith Case, supra.* But "an alleged indebtedness or liability which does not in fact exist or which is not a binding and legally enforceable obligation of the obligor cannot ordinarily constitute a consideration for a bill or note." 10 C. J. S. p. 605, § 150; 8 C. J. p. 216, notes 48, 50. There are, of course, exceptions, as notes against which the statute of limitations has run and notes which have been discharged in bankruptcy. But under the rule above stated the consideration of the note in suit, if there is any, must rest on the facts

that a contract existed between Mr. Hatten and the claimant that he would pay her for the things furnished him, and that he executed and delivered to her this note as compensation for those things. I cannot read from the evidence in this case any such agreement. Such agreement, if it existed, must be made out from the testimony of the claimant herself. It is true that the instrument in suit is a negotiable promissory note reciting that it was given for value received, and that there is a presumption in the first instance that it was given for a valuable consideration. But when the testimony shows precisely what the consideration was, the presumption is of no avail to support the note.

The testimony of the claimant, so far as it bears on the consideration for the note, is as follows:

"The consideration of the note was for the privileges that he had had in my home over a period of a number of years, for the services that had been rendered to him through my family and myself over a period of years, for privileges that I had made for him and for other things I did for him that he considered of value to him to the amount of what he paid for my obligations. I knew Mr. Hatten for twenty-five years. At times he came to my home for meals during that entire time but not so frequently as in the last seven years. Sometimes he would be there for a couple of meals a week during the last seven years and sometimes I would not see him for a month, and then when my husband was sick he was there probably a couple of times a week and then later three times a week and in the last year he averaged about three or four times a week. He usually stayed and visited a while after mealtime. Sometimes he would stay for the evening. Sometimes he would come up before church Sunday morning and bring his collar along in his pocket, and would go in and get himself ready to go to church, and he would come there for lunch and spend the afternoon and along toward evening he would go home. Sometimes my son would take the car and take him home.

"On one occasion Mr. Hatten came up there and laid down on the studio couch. He claimed his hotel room was very cold and he would be almost frozen. I would start the

fire in the fireplace and he would go on the couch and fall asleep. This night I came down in the morning and he was still there. Several times in the evening he would fall asleep and I would let him lie there and would call my son and he would come over. Once it bothered me because he was sleeping so soundly. I called up my son and had him look him over and he said, 'he is having the sleep of his life, let him sleep and I will come over later.' Mr. Hatten was very sensitive. I would have my son drop in, not letting him know he was coming there to take him home. On that occasion he slept on the studio couch in the library. . . .

"I was asked, 'You weren't doing it with the expectation of getting money? And I answered, 'No, sir, I wasn't doing it expecting to receive money at that time, although I felt as though what we did for him I should be paid. I did not feel as though I could afford to take him out in my car as much as I did.'

"I was asked whether it registered very sharply with me, and I answered, 'I felt as though if he wanted to pay me all right, if he didn't all right. That is the way I felt about it.' That is my feeling at present. . . .

"I mean I rendered these same kind of services for twenty-five years. He never said anything about the period of time during which I had been kind to him. He did say he appreciated the privileges of my home and what my family and I had done for him. The services I rendered as the hostess in the home were the usual acts of hospitality I or anyone else would render to a guest in the home. I never presented this note to Mr. Hatten for payment."

From this testimony I am unable to see how anyone can spell out any legal obligation on Mr. Hatten's part to pay the claimant for what the claimant did for him. It seems to me plain that had the note not been given, the claimant would not have made any claim against Mr. Hatten or against his estate, and that if she had it would not have been enforceable as a legal obligation. Confessedly there was no legal obligation to pay for anything but the meals and use of automobile furnished. All else was a mere courtesy extended by one friend to another. While the claimant undertakes to include twenty-five years in the period during

which these things were furnished, whatever of them was furnished prior to the death of the claimant's husband, was not due and recoverable by the claimant, if due and recoverable at all, but by the claimant's husband, who lived until November, 1932. Thus the claimant could recover, if at all, for only meals and automobile service furnished for the five years after her husband's death. The value of the meals furnished could hardly have exceeded $200 during this period. The value of automobile service recoverable could hardly have been as much as that.

From the testimony quoted I cannot spell out a legal obligation of Hatten, nor can I see how the trial judge could.

Were we to discard all of the claimant's testimony but that to the effect that she expected to be paid for what she did for Hatten and her testimony that Hatten said—on two occasions—that she would be paid for what she did—I can see nothing more than an agreement to pay her the value of the services rendered, which as above stated would not exceed $400 or $500. For this $25,000 is demanded. To my single-track mind the most recoverable would be the value of the things furnished. The rest included in the note was a mere attempt to make a gift, a mere unfulfilled promise to make a gift. To make the things furnished constitute a consideration for the amount of the note there must be some reasonable relation between the value of the things furnished and the amount of the note. The amount of the note must constitute by force of some process of reasoning no more than permissible reasonable compensation for the things furnished. Else the way is opened for the plundering of estates through the subterfuge of getting mere promises to make gifts and invalid attempts at testamentary dispositions declared enforceable contracts. Suppose instead of writing in the note "twenty-five thousand dollars," Hatten had written in "twenty-five hundred thousand dollars." Would any court have held the note valid as supported by a

consideration? Upon the reasoning here relied on a note for $2,500,000 would be valid if the instant note is.

Two decisions of this court are relied on in particular as supporting the instant recovery. *Sheldon v. Blackman,* 188 Wis. 4, 205 N. W. 486, and *Estate of McAskill,* 216 Wis. 276, 257 N. W. 177. The facts in these cases, taken as a whole, are as far from the facts of the instant case as noon is from midnight, as a reading of the opinions in these cases will show. Besides it is said in the *Sheldon Case* (p. 11):

"There might be circumstances under which the inadequacy of consideration might be so grossly disproportionate to the value of the benefit received or the services rendered that a court might feel justified in refusing to enforce the contract."

The circumstances of this case, if ever there might be such circumstances, not only justify but in my opinion compel this court to refuse "to enforce the contract" if there was a contract.

The claimant drags in, and the opinion of the court seems to sanction it, the case of *Park Falls State Bank v. Fordyce,* 206 Wis. 628, 238 N. W. 516, as holding that a mere moral consideration will support a promissory note. The case, in my view, goes to no such extent. The holding of that case is correctly stated in *Elbinger v. Capitol & Teutonia Co.* 208 Wis. 163, 165, 242 N. W. 568, as follows:

"We there held that whenever the promisor has originally received value, material pecuniary benefit, under circumstances giving rise to a moral obligation on his part to pay for that which he has received, it is a sufficient consideration to support a promise on his part to pay therefor."

To the same effect is *Estate of Smith, supra.*

In my opinion the judgment of the county court should be reversed and the claim disallowed; or at most allowed only to the extent of the value of the meals and use of the

automobile furnished by claimant after the death of her husband.

A motion for a rehearing was denied, with $25 costs, on January 16, 1940.