Walter J. KOHLER, Plaintiff,

v.

KOHLER CO., a corporation, Herbert V. Kohler, Ernst & Ernst, a partnership, and Paul F. Johnson, Defendants.

No. 58–C–351.

United States District Court
E. D. Wisconsin.

Sept. 6, 1962.

Steven E. Keane, Lynford Lardner, Jr., Marvin E. Klitsner and William J. Kiernan, Jr., Milwaukee, Wis., for plaintiff, Foley, Sammond & Lardner, Milwaukee, Wis., of counsel.

Louis Quarles and Maxwell H. Herriott, Milwaukee, Wis., Edward J. Hammer and Lyman C. Conger, Kohler, Wis., for defendants Kohler Co. and Herbert V. Kohler, Quarles Herriott & Clemons, Milwaukee, Wis., of counsel.

Norman C. Skogstad, John J. Ottusch, Milwaukee, Wis., and Leslie Nichols, Cleveland, Ohio, for defendants Ernst & Ernst and Paul F. Johnson, Wickham, Borgelt, Skogstad & Powell, Milwaukee, Wis., of counsel.

GRUBB, District Judge.

This is an action at law to recover damages allegedly incurred by the plaintiff, Walter J. Kohler, upon the sale of his stock to the defendant, Kohler Co. It is alleged that plaintiff was induced by "the misrepresentations, half-truths, and omissions" of defendants to sell 21,-415.6139 shares of Kohler Co. common stock on February 20, 1953, at a price of $115 per share, which was at least $10 per share less than its "actual" or "fair market" value.

The actions of defendants in connection with the purchase of plaintiff's stock are attacked on two grounds: First, that they constituted a violation of § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891 (1934), 15 U.S.C.A. § 78j(b) [1] and of Rule X–10B–5 [2] of the Securities and Exchange Commission issued pursuant thereto; and second, that they constituted a breach of defendants' duty as "fiduciaries" and "insiders" to make a full and accurate disclosure to plaintiff of all facts material to the value of this stock which they were negotiating to purchase.

From the stipulations and evidence, the court finds the facts and legal conclusions as follows:

Plaintiff was a stockholder of Kohler Co. from 1931 to February 20, 1953, at which latter date he owned 21,415.6139 shares out of 200,000 shares of common stock outstanding. In addition, the Wal-

---

1. § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), provides in pertinent part as follows:

   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   \* \* \* \* \*
   "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. Rule X–10B–5, 17 C.F.R. 240.10b–5, of the Securities and Exchange Commission promulgated thereunder and pursuant to the power granted therein, provides as follows:

   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
   "(a) To employ any device, scheme, or artifice to defraud,
   "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
   in connection with the purchase or sale of any security."

ter J. Kohler Trust held 2,550.2180 shares. Plaintiff was an employee of Kohler Co. in various capacities from 1925 to 1947, a director from 1936 to 1947, and secretary of the company from 1937 to 1947. He has been president of the Vollrath Company, a kitchen utensils firm, from 1947 to the present, and a director of that firm from 1940 to the present. He was Governor of the State of Wisconsin from 1951 until sometime after the date of the sale here in question on February 20, 1953.

The defendant, Herbert V. Kohler, is an uncle of plaintiff and was at all times pertinent hereto the president and chairman of the board of directors of Kohler Co. The defendant, Kohler Co., is a closely held corporation, having had only twenty-six common stockholders up to the date of this sale. It is engaged primarily in the manufacture of plumbingware fixtures at Kohler, Wisconsin. The defendant, Ernst & Ernst, is a partnership engaged in the profession of public accounting and since 1930 has performed all auditing and public accounting work for Kohler Co. The defendant, Paul F. Johnson, is and was at all times subsequent to 1946 a partner in Ernst & Ernst and in 1953 was the partner in charge of the Kohler Co. account.

On February 2, 1953, plaintiff, while Governor of the State of Wisconsin, wrote a letter to Herbert V. Kohler in which he stated that he held an option to purchase certain stock in the Vollrath Company, of which he was then president, and that in order to exercise that option it would be necessary for him to dispose of his Kohler Co. stock. Plaintiff suggested four possible methods of accomplishing this, one of which was an offer to sell his stock to Kohler Co. for cash. Upon receipt of this letter, Herbert V. Kohler consulted with his fellow directors and officers as to whether the company would be interested in buying plaintiff's stock. It was then decided that Johnson should act as an intermediary and meet with plaintiff to "negotiate" the transaction and find out what price plaintiff had in mind.

On February 5, 1953, Herbert V. Kohler wrote to plaintiff that Johnson would contact plaintiff and that "He [Paul F. Johnson] has available the facts which might play a part in a discussion of values."

On February 11, 1953, plaintiff telephoned Lee Rasey, a partner in the brokerage and underwriting firm of Robert W. Baird & Co. There is a sharp dispute as to the substance of this conversation. Defendants claim that plaintiff asked Rasey for an "appraisal" of his Kohler Co. stock, and plaintiff, in pretrial depositions, did so testify. Later plaintiff stated that he did not ask for an "appraisal" but merely asked Rasey to furnish him with a comparison of the last ten years' earnings of American Radiator & Standard Sanitary Corporation and Crane Company (hereinafter referred to as "American-Standard" and "Crane"), the two major competitors of Kohler Co., and also told Rasey that he could get any financial data of the Kohler Co. from plaintiff's brother Robert. Plaintiff's brother, Robert E. Kohler, was a director of Kohler Co. from 1937 to March 1952. After that time, he remained a stockholder, owning 21,188.8547 shares in February 1953.

Rasey instructed a member of his staff who dealt in stock appraisal work, E. R. Van Horn, to supply plaintiff with the information requested. Van Horn obtained certain financial data on American-Standard and Crane from Standard & Poor's investment service (along with data on other companies not pertinent here) and financial data on Kohler Co. from Robert Kohler. This information included earnings of Kohler Co. for the eleven months ended November 30, 1952, and estimated earnings of $2,500,000 for the full year 1952. Van Horn indicated in his report to plaintiff that he did not have complete figures on Kohler Co. and that the difference between the reported eleven months' earnings of $1,568,000 and estimated 1952 earnings was "quite substantial." He concluded his report with an opinion that plaintiff's stock was worth "somewhere in the range of

$75 to $100 per share." Plaintiff testified that he wholly disregarded this report and the data contained therein because he regarded it as "incomprehensible" and "unreliable," and Van Horn himself characterized it as a "horseback opinion" since it was drawn up on short notice and with incomplete data.

Plaintiff made no disclosure to any of the defendants that he had acquired this information. He made no inquiry as to the "quite substantial" increase in estimated 1952 earnings.

Plaintiff then met with Johnson in Madison, Wisconsin, on February 13, 1953, to discuss the sale. Up to this point, plaintiff had decided upon an asking price of $125 per share, which price, he testified, was based upon his "judgment" and "general knowledge" of Kohler Co. There is no evidence as to how he arrived at this figure.

At this initial meeting, plaintiff told Johnson that he had a price of $125 per share in mind. The evidence is not clear as to what Johnson said, but plaintiff testified that Johnson at that time "mentioned" $115 per share, although Johnson did not make a firm offer to purchase the stock at that price. Johnson was instructed by Herbert V. Kohler to inquire whether the stock held by the Walter J. Kohler Trust would also be for sale, and plaintiff said it was not. Plaintiff also stated that he wanted an answer by February 18, 1953, and indicated that he wanted at least a $100,000 down payment with the balance within thirty to sixty days. Johnson then reported this discussion to Herbert V. Kohler in a telephone conversation from Chicago to Kohler, Wisconsin, indicating to him that plaintiff "Would be interested at around 115."

On February 15 and 16, 1953, Herbert V. Kohler again conferred with his fellow directors and officers, at which time they agreed that Johnson should inquire as to whether plaintiff would give a thirty day option to Kohler Co. to purchase his stock at $115 per share, the price of the option to be $5,000.

Herbert V. Kohler testified that the reason the company wanted an option was to enable them "to think it out a little bit more." He then sent $5,000 to Johnson in Chicago. Johnson returned the check because he felt that plaintiff would not consider giving an option. On February 19, 1953, Herbert V. Kohler again wrote to Johnson, this time authorizing him to purchase plaintiff's stock at $115 per share and upon the terms that plaintiff had suggested, i. e., $100,000 down and the balance in thirty to sixty days.

Meanwhile, on February 16, 1953, Johnson mailed to plaintiff from his Chicago office certain statistical data with the following letter:

"At the time of our discussion last Friday afternoon, it was agreed that I would furnish you with the statistical data that I had used in projecting the possible value of Kohler Co. common stock. These projections are based upon average earnings and other data of Crane Company and American Radiator & Standard Sanitary Mfg. Co. I believe that these schedules are self-explanatory but should any question occur to you, I shall endeavor to answer it."

The data furnished included a series of ten projected values of Kohler Co. stock ranging from $58.83 to $149.38, based upon certain comparative ratios of Crane and American-Standard, both of which are publicly traded stocks. The ratios employed were (1) average ten-year earnings to market price, (2) average five-year earnings to market price, (3) average ten-year dividends to market price, (4) average five-year dividends to market price, and (5) book value to market price. The first four ratios were derived from financial data of the three companies for the ten (or five) years ending December 31, 1951, and the fifth ratio was derived from the book values as of December 31, 1951. No data for the year 1952 was employed. This was the only financial data concerning Kohler Co. furnished to plaintiff by the defendants.

Upon receipt of this data, plaintiff examined the figures, and as he testified, " * * * really the only figures that would justify a price much lower than that [i . e., the $125 per share that he had in mind] would be if you took into account the book value of the shares * * *." The data indicated that Crane stock was selling on the market at approximately 55 per cent of book value, and American-Standard was selling at approximately 96 per cent of book value. Plaintiff claims that the disparity between these market-to-book-value ratios were so great that he decided to average the two percentages, resulting in 75.5 per cent, and apply this ratio to the Kohler Co. book value of $155.60. This resulted in a figure of $117.48, which figure, plaintiff claims, was close enough to $115, and was the sole reason for his willingness to reduce his demand to that price.

On February 17, 1953, plaintiff claims that he telephoned Johnson and asked him to compute the results of a certain "formula" which plaintiff devised. Plaintiff stated that he had noted "that Standard & Poor's stock index at that time was selling about ten-year average earnings of the corporations that comprise or compose the index. At the same time it was also selling about six times five-year average earnings. Rather than to take either one of those figures, I suggested to Mr. Johnson that he compute them both, [using Kohler Co. earnings] add them together, and divide by two, * * *." Plaintiff stated that Johnson called back the same day or the next and told him that the result of this calculation was $125 and some cents per share. Plaintiff claims to have taken this figure as some confirmation of the $125 per share that he believed was the value of the Kohler Co. stock at that time. Johnson testified that he had no recollection of these two telephone conversations.

On February 20, 1953, plaintiff met with Johnson to consummate the sale of plaintiff's stock to Kohler Co. At this meeting plaintiff discussed the figure of $117.48 which he had arrived at by averaging the market-to-book-value ratios as outlined above, and commented that in his judgment this calculation would justify a price of $120 per share as well as a price of $115 per share. Johnson agreed that it would. The parties then signed the contract, and the shares were transferred.

Sometime in 1958 plaintiff received certain Kohler Co. financial data in connection with his efforts to advise his son Terry with regard to the sale of Terry's Kohler Co. stock, and upon examining this data and making further investigations commenced this lawsuit.

We now come to the specific allegations regarding statements made by defendants which are claimed to be untrue and incomplete in that they omitted material facts necessary to make them not misleading in the light of the circumstances under which they were made.

## 1952 KOHLER CO. FINANCIAL DATA

Plaintiff complains that defendants failed to disclose to him the material fact that complete figures on 1952 earnings and other financial data of Kohler Co. were available for his examination. On February 14, 1953, the day after the first meeting between plaintiff and Johnson, Ernst & Ernst had completed the "field work" at the company plant on its yearly audit. The final annual audit report was not mailed to Kohler Co. until February 26, 1953, six days after the sale. All data which made up the report was available to Johnson at the time of the purchase negotiations herein. This fact was not communicated to the plaintiff.

It is stipulated that none of the defendants at any time during the negotiations refused or failed to provide any information asked for by the plaintiff and that plaintiff received all information requested by him. Plaintiff alleges that the ten projected "possible" values of his stock furnished by Johnson were false and misleading in that they failed to take into account the 1952 financial data of Kohler Co.

The testimony and evidence upon the trial showed that sometime after Johnson submitted to plaintiff the data referred to above on February 16, 1953, he computed the same ratios and projected values on a separate paper, but this time he substituted 1952 earnings for the 1942 and 1947 earnings in the ten and five-year earnings averages, respectively, and substituted 1952 book values for 1951 book values. Plaintiff was not shown nor informed of these separate computations, the result of which produced six projected values [3] ranging from $87.97 to $165.87. An average of these values is $124.84. There is no evidence as to why Johnson made this second series of projections or that these or any other figures were discussed among the defendants in the period during which the negotiations were taking place.

A few comments on this second series of computations seem apropos at this point as they relate to plaintiff's claim that this information was material and and was wrongfully withheld from him. First, although Johnson had complete Kohler Co. data for the year 1952, he did not have such data for the other two companies, Crane and American-Standard, nor was such data available in any published source. In computing this second series of projected values which were not disclosed to plaintiff, Johnson attempted to estimate the 1952 results of these other two companies. The actual 1952 results, when published, showed that Johnson's attempted estimates were wide of the mark. (He estimated earnings of $1.14 per share for American-Standard, while the actual earnings were $1.78 per share; and he estimated earnings of $3.69 per share for Crane, while the actual earnings were $3.96 per share.) Secondly, the earnings per share of the Kohler Co. common stock in 1952 were substantially *less* than the earnings per share in 1951 ($17.92 in 1951 as compared to $12.06 in 1952);

in fact, there was a steady decrease in earnings each year from 1948 through 1952. Plaintiff points out that despite this factor, the fact remains that as a result of updating the averages as Johnson did on the undisclosed document, the projected values of Kohler Co. stock would be higher when compared with its two competitors. This is true with regard to the different projected values on the face of the two series of computations made by Johnson, but his theory is based on erroneous premises. It disregards the fact that the two competitors of Kohler Co. had substantially higher earnings than Johnson had estimated on the undisclosed document. Further, plaintiff conceded that he understood the purpose of the computations furnished him was for comparative analysis only. The fact is that plaintiff himself, without any suggestion by defendants, determined that the comparative market-to-book-value ratios were the only factors to justify reducing his price to $115. It was book value, and not earnings, that he relied upon according to his own testimony.

## EXCESS PROFITS TAX REFUND

Plaintiff claims that a material factor in determining the value of his stock was a tax refund in the amount of $488,529.76, together with interest thereon in the amount of $106,061.95. This refund and interest resulted from an overpayment of federal excess profits taxes paid by Kohler Co. in the years 1940 through 1945 and were received on or about January 10, 1953. All defendants were aware of the receipt of this refund and interest. They did not inform the plaintiff of this fact during the negotiations. The amount of this refund was added directly to earned surplus in the 1952 financial statements of Kohler Co., and the amount of the interest was included in the 1952 profit and loss statement as an item of income for that year. These financial statements

---

3. There was also a series of projected values based on dividends. It is generally conceded that the dividend record is not considered an important factor when a company is buying back its own stock, nor did plaintiff so consider it.

were included in the 1952 annual audit report of Ernst & Ernst, which report was not mailed to the Kohler Co. until February 26, 1953. Plaintiff alleges a breach of defendants' statutory and common-law duty by their failure to disclose the receipt of this refund and interest, the effect of which was to increase the book value of his stock by $2.70 per share.

## KILN REPAIR EXPENSE ACCRUAL ACCOUNT

Plaintiff alleges that in addition to the failure of defendants to disclose the 1952 Kohler Co. financial results, they even misrepresented the 1951 book value of the Kohler Co. common stock. Kohler Co. carried a "Kiln Repair Expense Accrual" account—a reserve account—as a liability. This reserve, like so many reserves set up by conservative companies, was set up for anticipated future expense, the exact amount and date of which could not be accurately determined. Because repairs to the interior of its pottery kilns cannot be made without shutting down the kilns, Kohler Co. has for many years kept this account on its books and financial statements, which account since 1950 has been in the amount of $250,000 at the end of each year. This specific account was not shown as a separate item in the audit reports, but it was included under the general heading of "Accrued Expenses." The account was shown as a separate item, however, in the liability section of the monthly financial statements which were prepared for the company directors. Plaintiff alleges that this account was not a genuine liability but was in fact merely a "contingency reserve" having no relationship to actual kiln repair expenses, since the account was maintained at a constant $250,000 at the end of each year. Plaintiff's theory is that this account should have been "reversed" at the year end and, in effect, restored to surplus so that it would be added in the computation of book value. If this had been done, the book value would have increased by $1.25 per share.

## RESERVE FOR INDUSTRIAL LIABILITY

As a self-insurer under the workmen's compensation law of Wisconsin, Kohler Co. was responsible for the payment of claims made by employees for injuries sustained by them in the course of their employment. An account called "Reserve for Industrial Liability" was maintained on the books of the company. Charges and credits were made to this account periodically during the year, but at year end the account was adjusted and shown as a liability on the annual audit reports at a constant amount of $150,-000. Substantially the same claim is made by plaintiff as to this account, as with the Kiln Repair Expense Accrual account, i. e., that this was also merely a "contingency reserve," having no relationship to actual employee claims, and was, therefore, improperly deducted in computing book value. Plaintiff contends that the book value should have been increased by 75 cents per share and that defendants would be liable for failing to disclose this fact. Here again the company had a very definite potential liability on account of workmen's compensation losses. No insurer insuring such risks would fail to carry a reserve against them.

## INVENTORY ACCOUNTS

Plaintiff claims the book value was likewise understated by Johnson because the inventories of the Kohler Co. were valued at $11,517,272.03, whereas in fact their actual value was $12,735,533.03. The difference of $1,218,261, or $6.09 per share, was maintained in an account on the company books called "Inventory Reserve." Since 1946 Kohler Co. has used the "last in, first out" (LIFO) method of valuation for a portion of its inventories. This reserve was set up in 1946 to adjust the inventory to the LIFO method of pricing. The amount of the reserve varied from year to year and was reflected in the annual audit reports until 1949. In 1950 and 1951 this account was shown on the company books but not in the audit reports.

The LIFO method of valuation is used in conjunction with the accounting concept of pricing inventories at the lower of cost or market value—that is, if the cost, determined on a LIFO basis, is lower than the market value, the inventory is carried at cost for accounting and financial reporting purposes.

Plaintiff's contention is that the "reserve" of $1,218,261 is an arbitrary reduction from the value of the inventory in 1951 even if the "lower of cost or market" valuation is used, and that, therefore, defendants are liable for failing to disclose that this account was not included in the book value.

## EMPLOYEES' RETIREMENT ANNUITIES

Plaintiff's final contention is that defendants are liable for failure to disclose that Johnson, in computing book value for 1951, deducted the amount of $2,174,416.88, or $10.82 per share, because of an account on the books and financial statements called "Unamortized Cost of Employees' Retirement Annuities Based Upon Past Services." Much of the trial testimony and voluminous briefs submitted in this action have been devoted to this particular claim.

Since at least 1929, Kohler Co. had a practice of paying pensions to retired employees. These payments were carried as current expenses for accounting purposes. In 1948 a special stockholders' meeting was held to consider a revision of this "pay as you go" pension plan. It was determined that the increasing number of employees reaching retirement age would ultimately make the cost of the then-existing plan prohibitive. A new plan was adopted whereby a large part of the past service "liability"—credit already accrued by the employees—could be liquidated. Under this plan Kohler Co. entered into a contract with an insurance company whereby an annuity was purchased for each employee in an amount sufficient to pay the pension he would be entitled to receive, based on the number of years he was in the employ of the company. These annuities were purchased for cash in lump sum payments, $2,000,000 having been paid in 1948, $1,347,288.02 in 1950, and $37,839.92 in 1951. As these payments were made, the accounting treatment by Kohler Co., as shown on its annual audit reports, was to set up an account on the balance sheets called "Unamortized Cost of Employees' Retirement Annuities Based Upon Past Services." This account, reflecting the amount of annuity payments was shown as a deduction from the sum of the capital stock and surplus accounts.

In addition to this lump sum reduction, the company amortized, i. e., charged off to current expense, 10 per cent of these same payments each year. The purpose of this amortization was to comply with federal income tax laws (which allow a maximum annual deduction of 10 per cent of the cost of past service pension annuities), as well as to comply with the accounting procedures recommended by authorities in the accounting field.

The effect of the annual amortization expense was to reduce the annual earnings, and ultimately the surplus account was also reduced. It is plaintiff's claim that the accounting treatment of the annuity payments was improper because the surplus was purportedly reduced by double the proper amount. In other words, since the payments were treated as a deduction from net worth in a lump sum, it was improper to further charge earnings with the 10 per cent amortization of the same payments each year. It was strongly urged that the only acceptable accounting treatment of the pension annuities would be to set up an asset account (i. e., a prepaid expense) and amortize this asset over a number of years so as to gradually reduce net worth. Plaintiff further claims that even if the manner of accounting is not clearly improper, it was at least the statutory and common-law duty of defendants to disclose how it was treated so that plaintiff could have adjusted the book value and earnings data submitted by Johnson.

█ In passing on these claims, in the light of the legal principles involved, it is important to bear in mind what the basic legal issue in this case really is. The issue is: In negotiating for the purchase of plaintiff's stock, did the defendants have a statutory or common-law duty to actively disclose and volunteer information to the plaintiff as to (1) the financial condition and results of operations of Kohler Co. for the year 1952, (2) the receipt of the tax refund and interest thereon by Kohler Co. on or about January 10, 1953, and (3) the manner in which Johnson, defendants' agent, determined the book value and earnings of Kohler Co. from the books and records prior to 1952? There can scarcely be any doubt that the specific items complained about would be "material" as to the "book value" of plaintiff's stock. It is also obvious that there often is a strong difference of opinion as to the value of the stock of a closely held corporation having no publicly reported financial statements and no public market, such as Kohler Co.

The rather complex accounting issues are subordinate to the main issue stated above. Plaintiff's complaint is not grounded upon a stockholder's derivative action for corporate mismanagement. Nevertheless, plaintiff here does allege corporate mismanagement by the defendants, i. e., improper accounting procedures, upon the theory that if the accounting procedures misrepresented the Kohler Co.'s true financial condition, then defendants would be liable per se regardless of whether or not plaintiff might have known or relied upon such accounting procedures. It is appropriate at this point to dispose of these issues first.

█ With regard to Kohler Co.'s practice of maintaining the accounts called "Kiln Repair Expense Accrual" and "Reserve for Industrial Liability" as liabilities in the amounts of $250,000 and $150,000, respectively, little discussion is necessary. There is nothing in the record, other than plaintiff's bare allegations that in any way supports the theory that these are actually "hidden assets" or "contingency reserves" and not actually estimated liabilities which should be deducted in computing book value. Defendants have maintained that the purpose of these two accounts was to reflect estimated liabilities arising because of kiln repairs and workmen's compensation claims which are unascertained in amount.[4] The judgment of the company's management in these matters must be given great weight. A court may not interfere in the internal management of corporate affairs in the absence of a willful abuse of discretion, bad faith, or positive fraud on the part of the corporate directors and officers. Steven v. Hale-Haas Corp., 249 Wis. 205, 211, 23 N.W.2d 620, 768 (1946); Thauer v. Gaebler, 202 Wis. 296, 301, 232 N.W. 561 (1930). Plaintiff produced no evidence or expert testimony to show such bad faith, abuse of discretion, or fraud. Moreover, these accounts were actually shown as liabilities in the monthly financial statements prepared for the directors, including the years during which plaintiff himself was a director prior to 1947. These monthly statements also indicated the book value per share of Kohler Co. common stock, so that, as plaintiff admits, it would be a simple matter of arithmetic to determine from the balance sheet whether or not these accounts were included in book value. A failure to have carried adequate reserves against these contingencies would have resulted in a misrepresentation of the book value of the company.

4. The "Reserve for Industrial Liability" maintained by Kohler Co. was a comparatively minor sum considering the potential liability that can accrue under the Workmen's Compensation Act. See e. g., Guse v. A. O. Smith Corporation, 260 Wis. 403, 51 N.W.2d 24 (1952), where a total of $56,837.46 in benefits had been paid to one injured employee of the defendant. In addition, the briefs indicate that the defendant and its insurer had an additional probable liability of $346,500 based on the employee's life expectancy.

The issue as to the "inventory reserve" in the amount of $1,218,261, which was carried on the Kohler Co. books as a reduction from the lower of cost or market pricing of the inventory, is subject to substantially the same considerations. No testimony or evidence was adduced to prove the impropriety of maintaining this reserve or its omission from the calculation of book value.

Plaintiff concedes that the "last in, first out" method of valuing inventories is a generally accepted method. In fact, the LIFO method was adopted by Kohler Co. in 1946 when plaintiff was an officer and director, and at that time a reserve in the amount of $800,000 was set up on the company's books to adjust the inventory to LIFO pricing.

In 1949 plaintiff attended a stockholders' meeting, at which time it was explained that a reserve of $1,350,000 was deducted from inventories on the 1947 balance sheet to eliminate estimated cost price increases of inventory on hand, and that the reserve was increased to $1,865,-000 and again deducted from inventories on the 1948 balance sheet. No dissent was made by plaintiff to these procedures at that time. With this background, plaintiff cannot plausibly argue that this accounting procedure was in any respect improper, to say nothing of being a clear abuse of discretion or fraudulent.

The accounting treatment of the pension annuity costs stands on a somewhat different footing. Both plaintiff and defendants called experts in the field of public accounting, and it appears to be conceded by all that Kohler Co.'s method of accounting for this item is at least "unusual." Plaintiff's expert, Donald R. Jennings, characterized it as improper accounting. Jennings was a member of a committee which drafted a number of official pronouncements on this specific subject on behalf of the American Institute of Certified Public Accountants. The recommended procedure suggested by the committee in these bulletins is based upon the principle that pension annuity costs based upon employees' past services are actually incurred by business firms in contemplation of future services. It is contended that future intangible benefits are to be expected by the firm in the way of better employee morale, removal of superannuated employees from the payroll, and the attraction to the firm of more desirable employees as a whole. Accordingly, the committee suggested that such annuity costs should be allocated to current and future periods and should not be directly charged to surplus in a lump sum. Under this theory that pension payments will result in future value to the company, the clear implication is that an asset account should be maintained and then periodically charged off, i. e., amortized, during the present and future period benefited.[5]

In the bulletins it is recognized that substantial differences of opinion still exist and will continue to exist among accountants as to the proper method of accounting for pension costs, and that many firms have been charging such costs directly to surplus and not amortizing them over future periods. This view is based upon the theory that pensions are in effect compensation for past services and should not be permitted to affect any period other than those in which the services were performed. The committee also points out that its recommendations are not intended to be applied retroactively, and in any event there may be exceptions to the generally recommended rule.

Plaintiff has vigorously urged that even if it might be proper to charge the cost directly to surplus in a lump sum, under no theory is it permissible to charge the same cost to future years against income. His belief that this is

---

5. See Accounting Research Bulletins No. 36 (November 1948), No. 43 (1953), and No. 47 (September 1956), issued by Committee on Accounting Procedure, American Institute of Certified Public Accountants. (Exhibit Nos. 152, 152-J, 152-K.)

in effect a double charge against surplus, and consequently against net worth and book value, is erroneous. As explained before, the initial reduction of net worth and book value occurred when the payments were made and the charge made against surplus. *There was no further reduction of net worth and book value, however, because the annual amortization charge against income was offset by an equal reduction of the "Unamortized Cost of Employees' Retirement Annuities Based Upon Past Services" account.* In other words, the net effect upon net worth and book value is exactly zero.

Defendants' expert witnesses, Thomas D. Flynn and Ralph S. Johns, both partners in national certified public accounting firms and both eminent in their profession, characterized Kohler Co.'s handling of pension costs as acceptable accounting in view of the unusual features of the pension plan. The aspects of the plan which call for an exceptional treatment include the fact that large cash payments were made, totaling over three million dollars, to purchase these annuities, and the fact that each individual employee covered by the plan had vested contractual rights to receive a pension. While Kohler Co.'s plan prior to 1948 was not as formal and definite as the new plan, it is not for this court to say that Kohler Co.'s judgment that it had paid cash to liquidate a liability owed to employees who had accrued pension credits, if not contractual rights, under the earlier plan was improper.

As to the accounting treatment, therefore, the deduction from net worth to reflect the payment of this liability and the subsequent 10 per cent annual amortization charge pursuant to federal tax laws and the various accounting bulletins is but a reflection of the good faith judgment of the management in the handling of a complex accounting problem. It was, as defendants' expert stated, a "compromise solution." Moreover, it was not entirely unreasonable for the company to choose not to maintain an intangible asset on its books to reflect speculative future value in terms of increased employee morale, especially where it was believed that any such benefit (if it ever existed) had already been received under the prior pension plan. In this connection, the comment of Herbert V. Kohler, while perhaps something of an understatement, seems especially apt: "We are a conservative outfit." This fact was not "inside information," known only by those connected with Kohler Co. management.

In addition to the fact that the accounting treatment of the pension payments was fully disclosed on the company books and financial statements, as were all the other items discussed above, the evidence shows and the court finds that in 1949 plaintiff attended a stockholders' meeting, at which time the pension plan and the actions taken by the board of directors during the year 1948 were discussed, including the accounting treatment of the pension payments which were approved without dissent.

In view of what has been said above, it appears unnecessary to extend this opinion by a discussion of the voluminous testimony and evidence dealing with the accounting practices of other companies in regard to the specific accounts about which plaintiff complains. There has been no showing of abuse of discretion, bad faith, or impropriety in the accounting aspects of these items.

Did the defendants by reason of their failure to specifically disclose to plaintiff the Kohler Co. tax refund, the 1952 financial data, and the manner in which Johnson had computed book value per share (1) employ any device, scheme, or artifice to defraud, or (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) engage in any act, practice, or course of business which operated as a fraud or deceit upon the plaintiff in con-

nection with the purchase of his stock on February 20, 1953? [6]

■ Although the statute and rule are silent on the point, it is now generally recognized that they afford to the seller of closely held securities a remedy for money damages. Matheson v. Armbrust, 284 F.2d 670 (9th Cir.1960), cert. denied 365 U.S. 870, 81 S.Ct. 904, 5 L. Ed.2d 860 (1961); Hooper v. Mountain States Securities Corporation, 282 F.2d 195, 201 (5th Cir.1960), cert. denied 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Errion v. Connell, 236 F. 2d 447 (9th Cir.1956); Fratt v. Robinson, 203 F.2d 627, 37 A.L.R.2d 636 (9th Cir.1953); see also 15 U.S.C.A. § 78bb.

■ The Securities Exchange Act and Rule X–10B–5 thereunder are involved in this action because of the use of interstate instrumentalities, i. e., the United States mails and interstate telephone conversations in connection with the negotiations for the sale of plaintiff's stock. This court, having asserted jurisdiction to decide the action under the federal statute, may also exercise its pendent jurisdiction to decide the action insofar as it is also grounded upon Wisconsin common law. Errion v. Connell, supra; Fry v. Schumaker, 83 F. Supp. 476 (E.D.Pa.1947); Connelly v. Balkwill, 174 F.Supp. 49 (N.D.Ohio 1959), aff'd 279 F.2d 685 (6th Cir.1960).

Although the statute specifically applies to "any person," it is generally applied to what are known as "corporate insiders," i. e., directors, officers, or majority stockholders who purchase the stock of a minority stockholder without disclosing material facts affecting the value of the stock, known to the "insider" by virtue of his inside position but not known to the selling minority stockholders, and which information would have materially affected the judgment of the seller. Kardon v. National Gypsum Co., 73 F.Supp. 798, 800 (E.D. Pa.1947). The rule is aptly stated in

Speed v. Transamerica Corp., 99 F.Supp. 808 at page 829 (D.Del.1951):

" * * * The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction. Some courts have called this a fiduciary duty while others state it is a duty imposed by the 'special circumstances'. One of the primary purposes of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., was to outlaw the use of inside information by corporate officers and principal stockholders for their own financial advantage to the detriment of uninformed public security holders. * * * "

■ Only one reported decision has been found wherein a complaint was sustained against a corporation itself which bought back its own stock through the corporate director—Northern Trust Co. v. Essaness Theatres Corp., 103 F. Supp. 954 (N.D.Ill.1952). There appears to be no valid reason why the duty to make full disclosure should be any less stringent upon the issuing corporation itself than upon an officer or director buying for his own account.

■ In the instant action, if Kohler Co. itself were liable for withholding material information, then the other defendants would also be liable as agents of the company and as joint tort-feasors. Moreover, defendants Herbert V. Kohler, Kohler Co., and Ernst & Ernst would be liable as principals and as "controlling persons" as that term is used in § 20, Securities Exchange Act of 1934, 15 U.S.C.A. § 78t(a). See Hawkins v. Merrill, Lynch, Pierce, Fenner & Beane, 85 F.Supp. 104, 123 (W.D.Ark.1949).

6. See footnotes 1 and 2.

A careful reading of all the cases, however, establishes that plaintiff's cause of action has no merit under any theory of statutory or common-law duties. This is not the case of an uninformed, uneducated plaintiff lacking business acumen. This is a plaintiff who is a highly successful businessman and was familiar with financial statements and specifically with all the accounts about which he now claims were not explained to him.

Exhibit 158 lists the stockholders of the Kohler Co. as of February 19, 1953. It shows that in addition to plaintiff's personal stock holdings, the Walter J. Kohler Trust held in excess of 2,550 shares, and the Robert E. Kohler Trust held in excess of 2,700 shares. It shows that many members of the Kohler family were substantial stockholders. Defendants should not be called upon to anticipate that a businessman as astute as plaintiff, with plaintiff's previous connection as an officer and director of the company, who personally owned its stock which he valued in excess of two million dollars, whose trust owned in excess of 2,550 shares, whose brother owned over 21,000 shares, who had as many relatives connected with the company as plaintiff did, and who from his previous connection with the company must have been well acquainted with many of its officers and employees, and who lived in a small community, would not have followed the affairs of the company closely after he ceased to be a director. They should not be called upon to anticipate that plaintiff's "general knowledge" of the company and its operations was not detailed and accurate. Requiring an "insider" to reveal every detail of the practice of the corporation with reference to its accounting methods and reserves and with reference to its assets and liabilities in general to a person as familiar with the company and its practices as was plaintiff would place an intolerable burden on "insiders."

Not only were all the items—tax refund,[7] 1952, earnings, kiln repair accrual, industrial liability reserve, inventory reserve, and pension costs—disclosed on the company's books and records for plaintiff's inspection, had he asked for them, but indeed in most cases the accounting treatment of these items had been specifically disclosed to him during his tenure as a company director prior to 1947 and thereafter at stockholders' meetings.

In addition, the pension plan and inventory reserve accounts were explained at stockholders' meetings which plaintiff attended in 1948 and 1949. Plaintiff concedes that the internal financial statements prepared each month would have been given to him for his inspection had he asked for them. These statements disclosed the book value per share, and although he testified that he never had occasion to calculate the book value himself while he was a director, he knew that it was just a "matter of arithmetic," i. e., deducting the total liabilities from the total assets and dividing by the number of shares outstanding. The essence of his claim, then, is that defendants may not furnish summaries of financial data without subjecting themselves to liability for failure to disclose the details behind these summaries without plaintiff's having to ask for them. Again it must be emphasized that all the

---

**7.** The tax refund was shown on the December 31, 1952, "After Closing Financial Statement" of Kohler Co., as were all the other accounts except the inventory reserve which, since 1950, was carried only on the company books. The 1952 earnings and book value of $169.26 per share was also shown on this statement. The evidence does not indicate when this statement was prepared, but it must have been available prior to the sale of plaintiff's stock. Plaintiff initially testified that in his experience as a Kohler Co. director, these statements generally came out at about the end of the third week or the beginning of the fourth week in January. He later qualified this and stated that they generally preceded the annual audit report "by some unspecified period of time. What that period is, I just can't say; I don't know." He also stated that the year end closing statements were never materially different from the annual audit reports.

data furnished plaintiff was exactly as shown on the company's books and that which was not furnished was also on the books. Plaintiff contends that he cannot be expected to remember what had been disclosed to him five or six years before and that what recollection he did have was "hazy" and "mistaken." [8] By the same token, defendants cannot be expected to assume that plaintiff would not inquire as to any items of financial data about which he would like a more detailed analysis if his memory was "hazy."

Plaintiff testified that one factor which induced him to seek a quick sale was the fact that he was concerned about the labor situation existing at Kohler Co. at that time. He believed that a strike was imminent, and as Governor of the State of Wisconsin, he did not want to be in a position of having to act to preserve the peace while owning stock in Kohler Co. Even if, as plaintiff alleges, an agreement were reached between the company and the union shortly after the sale, there is no evidence whatever that defendants knew such an agreement was imminent or that they took advantage of plaintiff's concern in order to induce him to sell his stock.

Nor is there any evidence to substantiate plaintiff's claim that the purchase of his stock enabled Herbert V. Kohler to gain mathematical voting control of the company. Herbert V. Kohler owned 17,998.9267 shares and was settlor of a trust which held 35,205.9133 shares. He was not one of the trustees, however, and did not vote any of this trust stock. On some occasions, he voted the stock owned by his sisters and by Kohler Foundation, Inc., but there is no evidence that he held an irrevocable proxy to vote any of these shares. The evidence supports the conclusion that Herbert V. Kohler "dominated" the board of directors. This fact must have been known to plaintiff long prior to the sale of his stock.

It was plaintiff who was anxious to sell. Plaintiff had set a deadline of February 18, 1953, for the sale. Herbert V. Kohler told Johnson to try to get a thirty day option because "we wanted a chance to think it out a little bit more."

Plaintiff maintains that an action for violation of § 10(b) and Rule X–10B–5 is a unique one and is far more sweeping than the common-law tort of deceit, dispensing in whole or in part with most of the common-law elements. There is clear language in many cases to support this theory. See, e. g., Ellis v. Carter,

8. Plaintiff's conclusion that the inventory and industrial liability reserves were as sets to be added back into net worth at the year end was apparently based on the practice of Vollrath Company in handling similar accounts. This merely reflects the difference of opinion and good faith judgment of corporate management as to what is properly an asset and what is a liability, a question disposed of in the beginning of this opinion. If plaintiff had asked for a detailed analysis of the book value figure or calculated it himself, he would have discovered that Kohler Co. did not consider these as assets. Moreover, American-Standard, one of the competitors whose financial data was compared with that of the Kohler Co., had similar reserves which were treated as liabilities and deducted in computing book value, so that the comparison was accurate. Plaintiff also points out that Kohler Co., on two occasions prior to the sale of his stock, purchased the stock of two key employees at book value pursuant to contracts entered into between the employees and the company, and in each instance the "Unamortized Cost of Employees' Retirement Annuities Based Upon Past Services" was *not* deducted but was added into the computation of book value. Defendants maintain that this was a "mistake" which was subsequently caught and corrected. They point out five later purchases of key employees' stock at book value—two instances prior to the purchase of plaintiff's stock and three instances after—in which book value was computed by deducting this account as was done by Johnson in the data furnished plaintiff. Whether the initial calculations were a "mistake" or not, the books and financial statements in 1951 and 1952 clearly disclosed that this account was not added into net worth and book value.

291 F.2d 270 (9th Cir.1961), at page 274:

" * * * Section 10(b) speaks in terms of the use of 'any manipulative device or contrivance' in contravention of rules and regulations as might be prescribed by the Commission. It would have been difficult to frame the authority to prescribe regulations in broader terms. Had Congress intended to limit this authority to regulations proscribing common-law fraud, it would probably have said so. * * * "

In Kardon v. National Gypsum Co., 73 F.Supp. 798, at pages 802–803 (E.D. Pa.1947), it is stated:

" * * * Perhaps all that would be necessary for this decision would be the determination that the conduct of the defendants came within the terms of the Act and the remedy sought is one provided by the law for redress. However, the broad terms of the Act are to be made effective in a case like the present one through application of well known and well established equitable principles governing fiduciary relationships. * * * "

■■ See also, e. g., Norris & Hirshberg, Inc. v. Securities & Exchange Commission, 85 U.S.App.D.C. 268, 177 F.2d 228, 233 (1949); Fry v. Schumaker, 83 F.Supp. 476 (E.D.Pa.1947); Texas Continental Life Insurance Company v. Bankers Bond Company, Inc., 187 F. Supp. 14, 23 (W.D.Ky.1960). When this broad language is read in the context of the facts of each case, it is apparent that in most, if not all, of the cases the facts that justified recovery under the statute and rule would also have justified recovery upon a common-law ground. The elements of "fraud" are often not stated with any specificity, either at common law or under the securities laws. In the final analysis, the extent to which the statute and rule go beyond common-law fraud simply depends upon the common-law jurisdiction. Connelly v. Balkwill, 174 F.Supp. 49, 56 (N.D.Ohio 1959),

aff'd 279 F.2d 685 (6th Cir.1960); 3 Loss, Securities Regulation, 1435–1436 (2d ed. 1961). The only traditional elements of common-law fraud that definitely appear to be unnecessary under the statute are scienter—knowledge of the falsity or misleading nature of the statement—and fraudulent intent to mislead or misrepresent. See Texas Continental Life Insurance Company v. Bankers Bond Company, supra, 187 F. Supp. at page 23. These elements have also been read out of the Wisconsin common-law action for fraud. It is sufficient to show that the defendant mistakenly or even negligently failed to disclose the true facts. DeSwarte v. First National Bank of Wauwatosa, 188 Wis. 455, 465, 206 N.W. 887 (1926); Stevenson v. Barwineck, 8 Wis.2d 557, 99 N.W. 2d 690 (1959); Haentze v. Loehr, 233 Wis. 583, 588, 290 N.W. 163 (1940); Neas v. Siemens, 10 Wis.2d 47, 55, 102 N.W.2d 259 (1960).

■ With regard to the element of reliance, although there is dicta to the contrary, this element appears to be indispensable to the cause of action upon either theory. Certainly it is reasonable to assume that reliance is inherent in the concept of a breach of duty to disclose material information. If a plaintiff does not rely upon the data he was furnished, how can he say that the undisclosed data was material or that the data he was furnished was "in the light of the circumstances" misleading? Absent proof of reliance, there is no liability. Reed v. Riddle Airlines, 266 F.2d 314 (5th Cir.1959); Mills v. Sarjem Corporation, 133 F.Supp. 753, 767 (D.N.J. 1955); 3 Loss, Securities Regulation, 1766 (2d ed. 1961).

Plaintiff had the report of Robert W. Baird & Co. It is difficult to believe that plaintiff entirely disregarded this report even though it was admittedly "incomplete" since it indicated earnings for the first eleven months of 1952 and an estimate of earnings for the full year of $2,500,000. (The actual earnings were $2,447,498.54.) The report also indicated that the difference between the

eleven months' earnings and the estimated earnings of $2,500,000 for the full year was "substantial." These figures were furnished to Robert W. Baird & Co. by Robert Kohler at plaintiff's request, and it is doubtful that plaintiff did not give the data some consideration. In any event, to constitute actionable fraud, it is not necessary that plaintiff have relied exclusively upon the defendants—Household Finance Corporation v. Christian, 8 Wis.2d 53, 98 N.W.2d 390 (1959)—and the evidence does indicate that plaintiff did place some reliance upon them despite the Robert W. Baird & Co. "appraisal." Cf. Reed v. Riddle Airlines, supra.

Under the present law, it is apparent that the duty imposed upon "insiders" is neither broader nor stricter than that imposed by Wisconsin common law, and there is no duty to disclose, under either theory, those facts which are equally available to both buyer and seller. Connelly v. Balkwill, supra.

Although there is a surprising paucity of reported decisions which have gone to final judgment for the plaintiff upon the merits, it is apparent that the basis of liability has invariably been the finding that important inside information, *not ascertainable by an inspection of the company's books and records*, was not disclosed to the plaintiff. The typical situation involves a corporate official who approaches the minority stockholder with an offer to purchase his stock without disclosing future transactions or prospects, such as a prospective merger or liquidation or an assured future sale of corporate assets or large blocks of stock, which materially enhances the value of the minority shareholder's stock. No case has been cited or found where the minority stockholder himself initiated the sale and then several years later claimed the corporation was liable for failing to volunteer information as to *routine* corporate transactions and computations which were not inquired about during the negotiations.

In Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa.1947), a father and son sued two brothers for an accounting for profits resulting from the defendants' purchase of the plaintiffs' stock in violation of Rule X–10B–5. These four persons were the sole stockholders, officers, and directors, and they owned the outstanding stock in equal proportions. The court found a conspiracy existed between the defendants and a third company to which the defendants had sold the bulk of the corporate assets pursuant to a secret agreement made prior to their purchase of the plaintiffs' stock.

A leading case under Rule X–10B–5 is Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del.1951). In that case the plaintiffs were minority stockholders of a subsidiary corporation of which the defendant parent corporation, Transamerica, was the majority stockholder. Transamerica had inside information that the cash realization value of the subsidiary's large tobacco inventory was far greater than the value set forth in its published financial statements. This information was not made available to the minority shareholders. Intending to capture the enhanced value of this inventory by merging, dissolving, or liquidating the company, Transamerica purchased most of the minority-held stock directly from its holders. The price it paid was in excess of the current market but far below the redemption or liquidating value of the shares. It then caused the subsidiary to sell some of its tobacco, distribute the rest to its remaining shareholders, and dissolve. The court makes clear that the defendant's liability under the rule was founded upon the secret preconceived intent to dissolve the subsidiary corporation at the time it offered to buy plaintiffs' stock and thereby reap the profits on the enhanced value of the inventory.

Plaintiff's argument that this case is analogous to the defendants' failure to disclose the market value or "actual" value of Kohler Co.'s inventories is untenable. It is accepted accounting procedure to report inventories at *cost*, not market value (unless the market value is lower than cost). See Accounting Re-

search Bulletin No. 43, page 28, issued by the American Institute of Certified Public Accountants (1953). Different considerations apply where there is a plan to liquidate the inventory and not replace it at the current market value as in the Speed case, supra.

The cost value, determined by the last in, first out method, was disclosed on every balance sheet since 1946 when plaintiff was an officer and director. This of itself refutes the claim that the LIFO method was "unusual." As of 1951, the year for which Johnson gave plaintiff the book value of Kohler Co. stock, a survey was made by the American Institute of Accountants, in which survey it was found that of the 545 companies surveyed, more companies used the LIFO method than any other.

The Court of Appeals for the Seventh Circuit has passed upon the extent to which disclosure is required under Rule X–10B–5 in the recent case of James Blackstone Memorial Library Association v. Gulf, Mobile and Ohio Railroad Company, 264 F.2d 445 (7th Cir.1959), cert. denied 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959), where the plaintiffs, minority stockholders, claimed that the defendant, the majority stockholder, had a duty under the rule to disclose that defendant had planned to sell corporate assets at a large profit after buying plaintiffs' shares. The court found no such duty where the facts were that the defendant's planned sale was not assured but was only a possibility at the time it bought plaintiffs' stock. The court quoted with approval from Agatucci v. Corradi, 327 Ill.App. 153, 63 N.E.2d 630, 632, as follows at page 451 of 264 F.2d:

"'Special circumstances' such as an assured sale enhancing the value of the stock, known to the officers but not to the stockholder and not ascertainable from the books, modify the 'mere failure to disclose' doctrine."

Wisconsin law is to the same effect. See Nichol v. Sensenbrenner, 220 Wis. 165, 182, 263 N.W. 650 (1936); McMynn v. Peterson, 186 Wis. 442, 201 N.W. 272 (1925). Plaintiff's reliance upon Holty v. Landauer, 270 Wis. 203, 70 N.W.2d 633, 71 N.W.2d 926 (1955), is misplaced. There the court in dicta stated that a corporate director has a fiduciary obligation to a stockholder, when negotiating for the purchase of stock, to disclose all facts regarding the company's business which would affect the price of the stock. It found no basis for the claim of fraud or overreaching, however, where the stockholder had discussed the status of the business with a director and with company employees and had been permitted to peruse the corporate records.

There is a further and equally compelling reason why plaintiff could not recover damages in this action even if defendants had violated their statutory or common-law duties of disclosure. Section 28 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78bb, limits recovery to "actual damages on account of the act complained of." "Actual damages" are to be computed under the federal "out of pocket" rule applied in fraud actions, i. e., the difference between the price received by the plaintiff and the real or actual value of the stock at the date of the sale. Under this rule, a plaintiff is entitled to recover what he has lost by the sale but may not recover any actual or potential gain that was received by the defendants. Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527 (10th Cir. 1962); James Blackstone Memorial Library Association v. Gulf, Mobile and Ohio Railroad Company, 264 F.2d 445, 453 (7th Cir.1959), cert. denied 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959); Smith v. Bolles, 132 U.S. 125, 130, 10 S. Ct. 39, 33 L.Ed. 279 (1889); cf. Speed v. Transamerica Corp., 135 F.Supp. 176, 186–194 (D.Del.1955). What then was the "actual value" of the Kohler Co. stock on February 20, 1953?

Plaintiff has not alleged nor proved any "actual value" but merely claims that if he had known of the 1952 Kohler Co. financial data, the tax refund, and the fact that certain items were not included in the book value figures furnish-

ed to him by Johnson, he would have "held out" for a higher price of at least $125 per share. It is this alleged *minimum* actual value which plaintiff had originally conceived to be the actual value, based upon his "judgment" and "general knowledge" of the company, prior to the negotiations, and which he now claims is confirmed by the evidence. Although he claims the evidence indicates some undeterminable higher value, he limits his demand for damages to $10 per share. Even assuming the various items discussed above should properly have been added to the book value, to find actual damages here would be utter speculation. Not only are we dealing here with the stock of a closely held corporation with no public market, but we have no merger, liquidation, or sale of corporate assets upon which the court could find a valid criterion by which to judge the alleged enhanced value of the stock. *In fact, there is no evidence of record of any sales of Kohler Co. stock except those which have been made to Kohler Co. itself.* Under these circumstances, what other value can there be than the value Kohler Co. itself placed on the stock? It serves no purpose to theorize that the value was somewhere between $124 and $133 per share, as did plaintiff's own expert witness who based his testimony upon the very data that was furnished to plaintiff by Johnson. If this data, accurately transcribed from the company's records, indicated a value of at least $124 per share, why then did plaintiff sell it for $115? Nor would it be valid to apply plaintiff's formula of averaging the market-to-book-value ratios of Kohler Co.'s two major competitors and apply the resulting percentage to the book value of Kohler Co. stock. No expert stock appraiser has ever considered the book value to be more than one of many factors to be considered in valuing a closely held stock with no established market.[9]

The valuation of a closely held stock is not an exact science and in the final analysis depends upon the judgment and experience of the appraiser. Many factors must be given consideration—the company's history and management, operating expenses, earnings, book value, and the trend of sales and earnings compared with those of companies engaged in a similar business for which published financial data is available. In this connection, it should be noted that plaintiff's own expert appraiser testified that the most important factor is the profits or earnings record of the company, and that book value is of secondary importance. Bricks, mortar and machinery do not in and of themselves pay dividends or create any great market value. The usual question in the mind of an investor is: To what use have they been put and what has been the particular company's record of earnings? It is not the earnings data in the abstract that is important but rather *the past general trend of earnings which may serve as a guide to future prospects.*

The general trend of Kohler Co. earnings has been steadily downward from 1948 through 1952. In fact, even with the tax refund of $488,529.76 added to the Kohler Co. earnings for 1952, the total is still $684,152.93 less than the earnings for 1951.[10] If the earnings are to be given primary importance in valuation, plaintiff cannot maintain that he would have held out for a higher price

9. While a number of stock purchases were made by Kohler Co. from certain key employees at book value, this was a matter of express contract. Plaintiff could have bargained for this price if he had so desired, just as he could have asked for an analysis of each account that, in the judgment of defendants, entered into the calculation of book value.

10. The accounting treatment by Kohler Co. was to add the tax refund directly to earned surplus for 1952. This had the same effect as adding it to the 1952 earnings, which are then transferred to the earned surplus account. Plaintiff's theory that the total refund should have been apportioned so as to restate the earnings for the years 1940 through 1945, the years to which the refund related, is not supported by any accounting principle and is without merit.

had he been given the 1952 Kohler Co. earnings.[11]

Plaintiff has not shown that defendants at any time made a direct representation that the stock had an actual value of $115 per share. Nothing to that effect appears on the range of projected possible values furnished him by Johnson, which values ranged from $58.83 to $149.38. Professor Louis Loss, an eminent authority on the subject of securities regulations, states in 3 Loss, Securities Regulation, 1463 (2d ed. 1961), as follows:

"* * * an insider is under no obligation to give the ordinary investor the benefit of his superior financial analysis. It has been aptly stated that, 'Even though a shrewd guess by an insider is often worth fifty accounting statements, it would be highly unfair to make him publicize his guess and then to hold him responsible if it turns out to be wrong.' "

In summary, defendants have violated no statutory or common-law duties in the negotiations for the purchase of plaintiff's stock, and plaintiff has suffered no damage. The value of his stock was $115 per share at the date of the sale.

Plaintiff's complaint alleges a violation of a criminal statute based up-

on fraud. Fraud is never presumed nor can it be established by inference. Mescall v. W. T. Grant Co., 133 F.2d 209, 211 (7th Cir.1943). In Estate of Hatten, 233 Wis. 199 at page 208, 288 N.W. 278, at page 282 (1940), the court stated:

"* * * In civil actions, where fraud, crime, criminal conduct or conspiracy is alleged, the burden rests upon him who so charges, to establish the proof of such allegations by clear and satisfactory evidence, * * *." (Citations omitted.)

In the *instant* case plaintiff has not established a cause of action for fraud by a preponderance of the evidence. His proof falls far short of establishing fraud by clear and satisfactory evidence.

In view of the foregoing, it is unnecessary to pass on the defenses raised by the answer, i. e., that plaintiff's cause of action is barred by the statute of limitations, waiver, estoppel, or ratification.

This decision incorporates all the material findings of fact as well as conclusions of law in conformity with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The clerk is directed to enter judgment dismissing this action and against plaintiff for defendants' costs and disbursements herein.

11. The projected values based upon the comparative figures of American-Standard and Crane were generally higher as calculated by Johnson on the undisclosed document, but as stated before, this was partially based on his underestimation of the 1952 earnings for these latter two companies. A further reason why the overall comparative averages were higher on the undisclosed document was the fact that in the ten-year averages, he dropped the 1942 earnings and added the 1952 earnings. In a ten-year spread, it is not difficult to see that elimination of the early noninflationary years of low earnings, such as 1942, would result in a higher average. The same considerations apply to the telephone conversation between plaintiff and Johnson in which plaintiff allegedly requested Johnson to compute the results of plaintiff's "formula" of ten times ten-year average earnings plus *six times five-year average* earnings divided by two. If Standard & Poor reported that the stock in its *500 stock index were selling on the market* at prices equal to these two earning multiples, this report must have been *based on five and ten-year average earnings up to and including 1951, since 1952 earnings were not yet available as of February 1953 for most corporations.* It could not be expected that Johnson would assume that plaintiff wanted him to include 1952 Kohler Co. earnings in this "formula" absent an express request that he do so. The result of such a calculation would be an invalid and meaningless comparison.